**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **3:24-CR-139** |
| | : | **(JUDGE MARIANI)** |
| | : | |
| **STEVEN WONG,** | : | |
| | : | |
| **Defendant.** | : | |

FILED
SCRANTON
JUN 05 2026
PER_____
DEPUTY CLERK

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court is Defendant Steven Wong's "Post-Trial Motion" (Doc. 237) arising out of a jury verdict finding Defendant Wong, and his co-defendant Solomon Rodriguez, guilty of all six counts of the Indictment filed against them on May 28, 2024. Defendant's motion requests dismissal of all charges against him pursuant to the Court's supervisory authority; judgment of acquittal as to certain portions of the jury's verdict relating to Count 4 and Count 5; and a new trial. For the reasons set forth below, the Court will grant in part and deny in part Defendant Wong's motion.

### II. PROCEDURAL HISTORY

Commencing in 2020, Defendant Wong has been the subject of four separate criminal cases (*Wong I, Wong II, Wong III*, and *Wong IV*), each relating to acts allegedly performed while a member of the Infamous Riders Motorcycle Club.

Because the parties are intimately familiar with the facts of all four cases, and the Court has previously written on *Wong I, Wong II,* and *Wong III*, in detail, the Court incorporates herein its procedural history set forth in its prior memorandum opinion granting in part and denying in part Defendant Wong's Motion to Dismiss in *Wong III* (3:22-cr-72, Doc. 270 at 2-10).  However, for purposes of the present motion, the Court will set forth below a brief recitation of the procedural history of the four *Wong* cases.

### *United States v. Wong* – 3:20-cr-310 (*Wong I*)

On December 9, 2020, Defendant Wong was indicted in *United States v. Wong*, 3:20-cr-310 (hereinafter "*Wong I*") for Kidnapping (Count 1), in violation of 18 U.S.C. § 1201(a)(1), and Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1) (Count 2).  Defendants Cornelius Green, William Murphy, and Odaliz Wong were named in the same Indictment.  (3:20-cr-310, Doc. 1).

Following a three-day jury trial, Wong was acquitted of the charge of Kidnapping (Count 1) on September 28, 2022 (*id.* at Doc. 245) and, one month later, he pleaded guilty to Possession of a Firearm by a Prohibited Person (Count 2) (*id.* at Doc. 258).  On February 23, 2023, this Court sentenced Wong to a term of imprisonment of 41 months on Count 2 of the Indictment followed by a 3-year term of supervised release.  (*Id.* at Doc. 293).

2

### *United States v. Wong* – 3:21-cr-271 (*Wong II*)[1]

On September 15, 2021, a federal grand jury indicted Wong in *United States v. Wong*, 3:21-cr-271 (hereinafter "*Wong II*"), along with four co-defendants: Eric LaSalle, Joshua Marsh, Joushton Rodriguez, and Solomon Rodriguez.  The Indictment charged Conspiracy to Interfere with Commerce by Robbery (Count 1), in violation of 18 U.S.C. § 1951, Interference with Commerce by Robbery (Count 2), in violation of 18 U.S.C. § 1951, and Use of a Firearm in Furtherance of a Crime of Violence (Count 3), in violation of 18 U.S.C. § 924(c)(1)(A).  (3:21-cr-271, Doc. 1).  Wong was thereafter superseded on January 19, 2022, wherein the charges remained the same but an additional defendant, Alarick Batista, was added to the indictment (*id.* at Doc. 50).  A Second Superseding Indictment was filed on February 22, 2023, which added the word "machinegun" to Count 3 (*id.* at Doc. 157).

Following several continuances, the Court scheduled trial as to Defendants Wong, Joushton Rodriguez, and Solomon Rodriguez to commence on June 26, 2023.  (*See id.*, Docs. 222, 223).[2]

---

[1] Although *Wong I*, *III*, and *IV*, were each assigned to the undersigned, District Court Judge Malachy Mannion presided over *Wong II*.

[2] Defendants LaSalle, Marsh, and Batista each signed plea agreements prior to the scheduling of the trial for June 26, 2023. (3:21-cr-271, Docs. 178, 179, 196).  Each of the three Defendants pleaded guilty to Count 1 of the Superseding Indictment, charging Defendants with Conspiracy to Interfere with Commerce by Robbery "[i]n August of 2020, and continuing to on or about August 30, 2020."

On June 21, 2023, the Court in *Wong II* entered a docket annotation stating that "[t]he trial scheduled to begin on Monday, June 26, 2023 has been continued. New date will be forthcoming." (3:21-cr-271, Dkt. annotation of June 21, 2023). No further trial scheduling Order was entered on the record. On November 20, 2023, the Government filed a "Motion to Dismiss Second Superseding Indictment" pursuant to Fed. R. Crim. P. 48(a) requesting dismissal of the Second Superseding Indictment as to Defendants Wong, Joushton Rodriguez, and Solomon Rodriguez. (*Id.* at Doc. 244). The motion was granted by the Court that same day. (*Id.* at Doc. 245).

### *United States v. Wong* – 3:22-cr-72 (*Wong III*)

On February 23, 2022, the grand jury returned an Indictment against Joushton Rodriguez, Solomon Rodriguez, and Cornelius Green in criminal action 3:22-cr-72 (hereinafter "*Wong III*"). The Indictment charged Defendants with Conspiracy to Interfere with Commerce by Robbery, in violation of 18 U.S.C. § 1951 (Count 1) and Use of a Firearm in Furtherance of a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A) (Count 2). (3:22-cr-72, Doc. 1).

On June 21, 2023, Wong was charged for the first time in criminal action 3:22-cr-72 when the grand jury returned a Superseding Indictment charging Wong, Joushton Rodriguez, Solomon Rodriguez, Mohammed Zeidan, and Rachel Lysakowski, as follows:

- o Conspiracy to Interfere with Commerce by Robbery, in violation of 18 U.S.C. § 1951, against Joushton Rodriguez, Solomon Rodriguez, Wong, Zeidan, and

4

Lysakowski, beginning on July 22, 2020, and continuing through September 2020 (Count 1).

- o Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951, against Joushton Rodriguez, Solomon Rodriguez, Wong, and Zeidan, on or about August 29, 2020 (Count 2).

- o Use of a Firearm in Furtherance of a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A) against Joushton Rodriguez, Solomon Rodriguez, Wong, and Zeidan, on or about August 29, 2020 (Count 3).

- o Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951, against Joushton Rodriguez, Solomon Rodriguez, and Wong, on or about August 30, 2020 (Count 4).

- o Use of a Firearm in Furtherance of a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A) against Joushton Rodriguez, Solomon Rodriguez, and Wong, on or about August 30, 2020 (Count 5).

- o Use of a Firearm in Furtherance of a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A) against Joushton Rodriguez, Solomon Rodriguez, and Wong, on or about September 14, 2020 (Count 6).

(3:22-cr-72, Doc. 98).

On March 22, 2024, the time for the filing of pre-trial motions having expired as to all defendants, this Court scheduled trial to commence on June 10, 2024. (*Id.* at Doc. 200).[3]

On May 8, 2024, the grand jury returned a Second Superseding Indictment against Wong, Joushton Rodriguez, Solomon Rodriguez, and Zeidan charging the defendants as follows:

- o Conspiracy to Interfere with Commerce by Robbery, in violation of 18 U.S.C. § 1951, against Joushton Rodriguez, Solomon Rodriguez, Wong, and Zeidan, beginning on July 22, 2020, and continuing through September 2020 (Count 1).

- o Attempted Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951, against Joushton Rodriguez, Solomon Rodriguez, Wong, and Zeidan, on or about August 29, 2020 (Count 2).

- o Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951, against Joushton Rodriguez, Solomon Rodriguez, and Wong, on or about August 30, 2020 (Count 3).

- o Use of a Firearm in Furtherance of a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A) against Joushton Rodriguez, Solomon Rodriguez, and Wong, on or about August 30, 2020 (Count 4).

---

[3] On February 21, 2024, a signed plea agreement was filed of record as to Defendant Lysakowski (3:22-cr-72, Doc. 189). Defendant Lysakowski thereafter entered a guilty plea before this Court on March 22, 2024 (*see id.* at Doc. 197). Trial was therefore only scheduled as to the remaining four co-defendants.

- o Use of a Firearm in Furtherance of a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A) against Joushton Rodriguez, Solomon Rodriguez, and Wong, on or about September 14, 2020 (Count 5).

- o Firearms Conspiracy, in violation of 18 U.S.C. § 924(o), against Joushton Rodriguez, Solomon Rodriguez, Wong, and Zeidan (Count 6).

(*Id.* at Doc. 218). The Second Superseding Indictment added for the first time a new Count 6, specifically a Firearms Conspiracy.

On May 22, 2024, this Court granted in part and denied in part Wong's "Motion to Dismiss for Violation of Defendant's Right to Speedy Trial". (3:22-cr-72, Docs. 270, 271). The Court dismissed Counts 1, 4, and 5 of the First Superseding Indictment (Counts 1, 3, and 4 of the Second Superseding Indictment) without prejudice based on a violation of the Speedy Trial Act and denied Defendant Wong's motion in all other respects. (*Id.*).

### United States v. Wong – 3:24-cr-139 (Wong IV)

On May 28, 2024, a federal grand jury returned an Indictment in the above-captioned case, which charged Defendants Wong, Joushton Rodriguez, Solomon Rodriguez, and Zeidan with the same six counts as those charged in the Second Superseding Indictment in criminal case number 3:22-cr-72:

- o Conspiracy to Interfere with Commerce by Robbery, in violation of 18 U.S.C. § 1951, against Joushton Rodriguez, Solomon Rodriguez, Wong, and Zeidan, beginning on July 22, 2020, and continuing through September 2020 (Count 1).

- o  Attempted Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951, against Joushton Rodriguez, Solomon Rodriguez, Wong, and Zeidan, on or about August 29, 2020 (Count 2).

- o  Interference with Commerce by Robbery, in violation of 18 U.S.C. § 1951, against Joushton Rodriguez, Solomon Rodriguez, and Wong, on or about August 30, 2020 (Count 3).

- o  Use of a Firearm in Furtherance of a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A) against Joushton Rodriguez, Solomon Rodriguez, and Wong, on or about August 30, 2020 (Count 4).

- o  Use of a Firearm in Furtherance of a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A) against Joushton Rodriguez, Solomon Rodriguez, and Wong, on or about September 14, 2020 (Count 5).

- o  Firearms Conspiracy, in violation of 18 U.S.C. § 924(o), against Joushton Rodriguez, Solomon Rodriguez, Wong, and Zeidan (Count 6).

(Doc. 1).[4]

Trial as to Defendants Wong and Solomon Rodriguez commenced on June 10, 2024.[5]  On June 21, 2024, the jury returned verdicts of guilty on Counts 1 through 6 against

---

[4] On May 31, 2024, this Court dismissed criminal action 3:22-cr-72 against Defendants Joushton Rodriguez, Solomon Rodriguez, Wong, and Zeidan upon motion by the Government.  (3:22-cr-72, Docs. 288, 289).

[5] Defendant Joushton Rodriguez entered a guilty plea before this Court on May 31, 2024 (see Docs. 86, 87) and therefore did not proceed to trial.  The Court also granted Defendant Zeidan's

both defendants. The jury further answered Jury Interrogatories finding beyond a reasonable doubt as to Wong and Solomon Rodriguez that (1) "a firearm was brandished in furtherance of a crime of violence and/or a firearm was brandished during and in relation to a crime of violence, as charged in [Counts 3 and 5] of the Indictment, in violation of 18 U.S.C. § 924(c), 18 U.S.C. § 2, and *Pinkerton v. United States*, 328 U.S. 640 (1946)" (Doc. 149, Jury Interrogatories 4.1 & 5.1) and (2) that "a machinegun was used, carried, or brandished during and in relation to a crime of violence, or a machinegun was possessed in furtherance of a crime of violence, as charged in [Counts 3 and 5] of the Indictment, in violation of 18 U.S.C. § 924(c), 18 U.S.C. § 2, and *Pinkerton v. United States*, 328 U.S. 640 (1946)" (*id.*, Jury Interrogatories 4.2 & 5.2).

On January 31, 2025, Defendant Wong filed the present "Post-Trial Motion" (Doc. 237).

### III. STANDARD OF REVIEW

A defendant may move for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Where "the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2).

> In ruling on a motion for judgment of acquittal made pursuant to Fed.R.Crim.P.
> 29, a district court must "'review the record in the light most favorable to the
> prosecution to determine whether any rational trier of fact could have found
> proof of guilty beyond a reasonable doubt based on the available evidence.'"

---

unopposed motion to sever his trial from the trial of the other defendants (Doc. 88). Following a separate jury trial, Zeidan was found guilty of Counts 1, 2, and 6 of the Indictment on September 5, 2025 (*see* Doc. 348).

> *United States v. Smith,* 294 F.3d 473, 476 (3d Cir. 2002) (quoting *United States v. Wolfe,* 245 F.3d 257, 262 (3d Cir. 2001)). A finding of insufficiency should be "'confined to cases where the prosecution's failure is clear.'" *Smith,* 294 F.3d at 477 (quoting *United States v. Leon,* 739 F.2d 885, 891 (3d Cir. 1984)). Courts must be ever vigilant in the context of Fed.R.Crim.P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury. *See United States v. Jannotti,* 673 F.2d 578, 581 (3d Cir.) (en banc) (trial court usurped jury function by deciding contested issues of fact), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *see also* 2A Charles A. Wright, FED. PRAC. & PRO. (Criminal 3d) § 467 at 311 (2000) ("A number of familiar rules circumscribe the court in determining whether the evidence is sufficient ... It is not for the court to assess the credibility of witnesses, weigh the evidence or draw inferences of fact from the evidence. These are functions of the jury.").

*United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). The Third Circuit has long advised that, in considering a post-verdict judgment of acquittal, the court "must uphold the jury's verdict unless no reasonable juror could accept the evidence as sufficient to support the defendant's guilt beyond a reasonable doubt." *United States v. Fattah*, 914 F.3d 112, 183 (3d Cir. 2019) (citing *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987)). In *United States v. Tyler*, the Third Circuit again reiterated the well-recognized standard:

> This review is "highly deferential" to the factual findings of the jury, and we "must be ever vigilant ... not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc) (alteration and omission in original) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)).

> > Thus, even if the evidence adduced is consistent with multiple possibilities, our role as a reviewing court is to uphold the jury verdict ... as long as it passes the bare rationality test. Reversing the jury's conclusion simply because another inference is possible – or even equally plausible – is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges, which is that

10

> [t]he evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt. It is up to the jury – not the district court judge or our Court – to examine the evidence and draw inferences. Unless the jury's conclusion is irrational, it must be upheld.

*Id.* at 433 (alteration in original) (internal quotation marks and citation omitted).

956 F.3d 116, 122-123 (3d Cir. 2020).

A defendant may also move for a new trial pursuant to Federal Rule of Criminal Procedure 33. Rule 33 provides in pertinent part that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. . ." Fed. R. Crim. P. 33(a).

> "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson,* 302 F.3d 139, 150 (3d Cir. 2002). However, even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial "only if it believes that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted." *Id.* (citation and quotation marks omitted). . . . Such motions are not favored and should be "granted sparingly and only in exceptional cases." *Gov't of Virgin Islands v. Derricks,* 810 F.2d 50, 55 (3d Cir. 1987) (citations omitted).

*United States v. Silveus,* 542 F.3d 993, 1004-1005 (3d Cir. 2008). The defendant "bears the burden of persuading the trial court that the interest of justice requires the grant of a new trial." *United States v. Ray,* 2016 WL 5787345, at *3 (M.D. Pa. 2016) (quoting *United States v. Hammer,* 25 F.Supp.2d 518, 534 (M.D. Pa. 1998)) (citing *United States v. Amirnazmi,*

11

648 F.Supp. 2d 718, 719 (E.D. Pa. 2009)).  "The discretion that federal trial courts exercise in addressing allegations of juror and prosecutorial misconduct extends to the determination of whether prejudice has been demonstrated." *United States v. Smith*, 139 F.App'x 475, 477 (3d Cir. 2005) (citing *United States v. Resko,* 3 F.3d 684, 690 (3d Cir. 1993)).  Where a defendant alleges that the cumulative effect of trial errors resulted in an unfair trial, a new trial is required "only when 'the errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'" *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993) (quoting *United States v. Hill,* 976 F.2d 132, 145 (3d Cir. 1992)).

In addition, the Due Process Clause of the Fifth Amendment "guarantees the right to a fair trial including the right to be free from prosecutorial misconduct". *United States v. Welshans*, 892 F.3d 566, 574 (3d Cir. 2018).  In analyzing a defendant's claim of prosecutorial misconduct, the court's analysis proceeds in two steps: (1) whether there was misconduct, and (2) whether "that misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process,' taking into account the entire proceeding." *Id.* (quoting *United States v. Repak*, 852 F.3d 230, 259 (3d Cir. 2017)). "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

12

"A finding of prosecutorial misconduct requires reversal unless the error is harmless." [*United States v. Brennan*, 326 F.3d 176, 182 (3d Cir. 2003)]. "If the error is constitutional, we will affirm [only] if we determine that the error is harmless beyond a reasonable doubt." *United States v. Helbling*, 209 F.3d 226, 241 (3d Cir.2000). "If the error is non-constitutional, we will affirm when it is highly probable that the error did not contribute to the judgment." *Id.* (quotation omitted).

*United States v. Lee*, 612 F.3d 170, 194 (3d Cir. 2010).

## IV. ANALYSIS

On January 31, 2025, Steven Wong filed a Post-Trial Motion (Doc. 237) requesting (1) dismissal of all charges "pursuant to the Court's supervisory authority"; (2) "Judgment of Acquittal in regard to the special jury interrogatories"; and (3) a new trial. The Court will address these requests in turn.

### A. Use of a Firearm in Furtherance of a Crime of Violence – Counts 4 and 5

The Court begins its analysis with Defendant Wong's arguments in both his request for judgment of acquittal and request for a new trial with respect to portions of his convictions in Counts 4 and 5 of the Indictment.[6]

Counts 4 and 5 of the Indictment charged Wong, and other defendants, with Use of a Firearm in Furtherance of a Crime of Violence, specifically, that the defendants "did knowingly brandish, carry, and use firearms, including a machinegun, during and in relation

---

[6] Count 4 related to the August 30, 2020, robbery at Joseph Lumia's residence and Count 5 related to the September 14, 2020, robbery at Michael Lydon-Thaxton's residence.

13

to, and possess firearms in furtherance of, a crime of violence . . . and did aid and abet the same", all in violation of 18 U.S.C. § 924(c)(1)(A), (B)(ii), and *Pinkerton*.  (Doc. 1, at 4-6).

The Court's jury instructions as to these two counts incorporated the parties' requested instructions, the relevant Third Circuit Model Criminal Jury Instructions and associated Commentary, and the statutory definition of "machinegun" as set forth in 26 U.S.C. § 5845(b).  The verdict form addressing Counts 4 and 5 asked the jury, as to each count and as to each Defendant, whether it found beyond a reasonable doubt that the "Defendant possessed a firearm in furtherance of a crime of violence and/or used or carried a firearm during and in relation to a crime of violence . . . all in violation of 18 U.S.C. § 924(c), 18 U.S.C. § 2, and *Pinkerton v. United States*, 328 U.S. 640 (1946)".  (Doc. 149, at 5, 8).  The verdict form also included two Jury Interrogatories following both Counts 4 and 5, asking the jury, as to each defendant, whether (1) "a firearm was brandished in furtherance of a crime of violence and/or a firearm was brandished during and in relation to a crime of violence, as charged in [Counts 3 and 5] of the Indictment, in violation of 18 U.S.C. § 924(c), 18 U.S.C. § 2, and *Pinkerton v. United States*, 328 U.S. 640 (1946)" (Doc. 149, Jury Interrogatories 4.1 & 5.1) and (2) whether "a machinegun was used, carried, or brandished during and in relation to a crime of violence, or a machinegun was possessed in furtherance of a crime of violence, as charged in [Counts 3 and 5] of the Indictment, in violation of 18 U.S.C. § 924(c), 18 U.S.C. § 2, and *Pinkerton v. United States*, 328 U.S. 640 (1946)" (*id.*, Jury Interrogatories 4.2 & 5.2).

14

On June 20, 2024, prior to the presentation of the parties' closing arguments, the

Court held a charge conference with the parties to address the Court's jury instructions and

verdict form. At the conference, no party had any objection to the Court's jury instructions.

(*See* Trial Tr., June 20, 2024, at 2-6). However, with respect to the verdict form, counsel for

Wong, addressing Jury Interrogatories 4.2 and 5.2, stated:

> What the jury has to find in regard to a machine gun, our belief is that Mr. Wong knew that a machine gun would be used or that it was reasonably foreseeable under *Pinkerton* that a machine gun would be used.

> So our proposal on the interrogatories would be that they are Defendant specific and that they would ask the jury unanimously finds beyond a reasonable doubt that Steven Wong knew, or that it was reasonably foreseeable to Steven Wong that a machine gun would be used, carried, or brandished, et cetera.

(*Id.* at 2). The Government objected, noting that it believed "that adds additional elements

of crime that are not found in law." (*Id.* at 3). The Government added that "[w]e proved

[Defendants] had the mens rea to commit 924(c), and we also proved that the firearm in

question was a machine gun, there is not an additional mens rea element of knowing it was

a machine gun." (*Id.* at 3-4). In response, Defendant's counsel hypothesized:

> I think, Your Honor, if I can add, I think the issue is, under the 924(c), you know, the Government put on evidence that there were both handguns used in the commission of these robberies and a machine gun used in the commission of the robberies.

> So if a jury -- a jury could reasonably find that the Government has established that Steven Wong knew or reasonably foresaw that a handgun would be used and convict him of the 924(c), and yet still find that he did not know or that it was not reasonably foreseeable that a machine gun would be used, and to get that increased 30-year mandatory minimum penalty, I do think the jury has to

15

find specific as to the machine gun, that it was reasonably foreseeable or that he had knowledge.

(Trial Tr., June 20, 2024, at 4). At no time did any party present case law or other legal authority to support their respective positions. Although the Court made the Jury Interrogatories specific as to each defendant as requested by Defendant Wong, the Court declined to make Defendant's requested change to Jury Interrogatories 4.2 and 5.2 as to whether each defendant knew, or could reasonably foresee, that a machinegun would be used in the crime of violence.[7]

Defendant Wong now moves for judgment of acquittal and for a new trial based on the absence of a *mens rea* instruction as to Defendant's knowledge of the characteristics of the machinegun and the wording of Jury Interrogatories 4.2 and 5.2. Specifically, Defendant's motion for judgment of acquittal argues that "there was insufficient evidence to support the jury's finding that Defendant knew the firearm at issue in the [§] 924(c) counts was a machinegun in Interrogatories 4.2 and 5.2" (Doc. 240, at 30) and, in relevant part, his motion for a new trial asserts that the "jury's finding that Defendant knew the firearm at issue in the [§] 924(c) counts was a machinegun was against the weight of the evidence"

---

[7] The Court also notes that Defendant Wong did not previously raise this potential issue prior to the charge conference. Notably, following the close of the Government's case-in-chief, Defendant Wong made "a general demurrer to all of the counts in the indictment and all of the elements of the offense, with respect to the sufficiency of the evidence" and specifically "objected" to the § 924(c) charge "as it relates to the machine gun charge" because counsel "[did not] believe there's been sufficient evidence presented that a rational jury could determine that the AR15, at the time it was utilized in the home invasions, was a machine gun." (Trial Tr., June 18, 2024, at 84-85). Defendant Wong did not argue, or suggest, that the defendant's knowledge of the type of firearm used was an element of the offense, nor that the Government had failed to adduce evidence of Wong's knowledge of the machinegun.

16

and that the "Court erred in instructing the jury regarding the mens rea requirement pertaining to the machinegun alleged in the [§] 924(c) counts and in drafting special interrogatories 4.2 and 5.2" (Doc. 240, at 36-38).

Section 924(c) of Title 18 provides in relevant part:

(1)(A) Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime --
    (i) be sentenced to a term of imprisonment of not less than 5 years;
    (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
    (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

(B) If the firearm possessed by a person convicted of a violation of this subsection--

. . .

    (ii) is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, the person shall be sentenced to a term of imprisonment of not less than 30 years.

18 U.S.C. § 924(c)(1)(A), (B)(ii).

In *United States v. O'Brien*, the Supreme Court addressed whether "the fact that the firearm was a machinegun is an element [of § 924(c)] to be proved to the jury beyond a reasonable doubt or a sentencing factor to be proved to the judge at sentencing." *United States v. O'Brien*, 560 U.S. 218, 221 (2010). Although the Court acknowledged that "there

are some arguments in favor of treating the machinegun provision as a sentencing factor", it ultimately concluded that the machinegun provision in § 924(c)(1)(B)(ii) is an element of the offense. *Id.* at 235. However, the Supreme Court explicitly declined to express any position as to whether "a defendant who uses, carries, or possesses a firearm must be aware of the weapon's characteristics." *Id.* at 222.

Since the issuance of *O'Brien* in 2010, most Circuit Courts, including the Third Circuit, have not addressed the issue left open by the Supreme Court: whether § 924(c)(1)(B)(ii) contains an implicit *mens rea* requirement. The three Circuits that have decided this issue in precedential opinions have reached different conclusions. Specifically, the Eleventh Circuit Court and D.C. Circuit Court have held that the machinegun element of § 924(c)(1)(B)(ii) does not require the Government to prove that the defendant knew that the firearm at issue was a machinegun, whereas the First Circuit has held that the Government is required to prove that the defendant knew the firearm at issue had the characteristics of a machinegun. *See United States v. Haile*, 685 F.3d 1211 (11th Cir. 2012); *United States v. Burwell*, 690 F.3d 500 (D.C. Cir. 2012); *United States v. Pérez-Greaux*, 83 F.4th 1 (1st Cir. 2023). *See also, United States v. Algarin-Torres*, 2025 WL 1088181, *1 (3d Cir. 2025) ("We have not decided whether § 924(c)(1)(B)(ii) contains an implicit mens rea requirement. Nor has the Supreme Court. . . . And our sister courts that have addressed the question have reached divergent results.") (internal citation omitted) (collecting cases).

18

The Eleventh Circuit first addressed the *mens rea* issue post-*O'Brien* in 2012. In *United States v. Haile*, the defendants were convicted at trial of drug related offenses as well as knowing possession of several firearms, including a machinegun, in conjunction with the drug-trafficking offenses. At sentencing, the District Court noted that Defendants' conviction under § 924(c)(1)(A) and (B)(ii) carried a mandatory minimum sentence of 30-years. Defendants appealed, raising a number of issues, including in relevant part "that the district court committed reversible error by failing to instruct the jury that, to establish a conviction for machine-gun-possession, the jury must find that (1) the defendant possessed a machine gun and (2) knew the firearm was a machine gun when he possessed it." *Haile*, 685 F.3d at 1218. The Eleventh Circuit rejected this argument, stating:

> In [*O'Brien*], the Supreme Court held that the fact that a firearm was a machine gun was an element of the § 924(c)(1)(B)(ii) offense rather than merely a sentencing enhancement. *O'Brien*, 130 S.Ct. at 2180. In other words, the government must prove beyond a reasonable doubt that the firearm in question was actually a machine gun. *Id*. at 2175-80. *O'Brien* did not hold that a defendant's knowledge that a firearm is a machine gun must also be so proved. And nothing in the text of § 924(c)(1)(B)(ii) makes knowledge of the firearm's characteristics an element of the offense.

*Id*. The Circuit Court further reasoned:

> Indeed, this court has held that § 924(c)(1)(B)(ii) "does not require proof of particularized knowledge of the weapon characteristics." *United States v. Ciszkowski*, 492 F.3d 1264, 1269 (11th Cir. 2007) (internal quotation marks omitted). Although *Ciszkowski* construed § 924(c)(1)(B)(ii) as a sentencing enhancement – a construction that the Supreme Court in *O'Brien* rejected – *O'Brien* did not expressly overrule, nor did it even mention, *Ciszkowski*. Thus, under our prior-precedent rule, *Ciszkowski*'s holding that "proof of particularized knowledge of the weapon characteristics" is not required remains controlling.

*Id.*

Soon after the issuance of *Haile*, the D.C. Circuit, *en banc*, reached a similar conclusion. In *United States v. Burwell*, the Circuit Court addressed "only a single legal question . . . : whether 18 U.S.C. § 924(c)(1)(B)(ii), which imposes a mandatory thirty-year sentence for any person who carries a machinegun while committing a crime of violence, requires the government to prove that the defendant knew the weapon he was carrying was capable of firing automatically." 690 F.3d at 502. The D.C. Circuit answered this question in the negative, explaining:

> Section 924(c)(1)(B)(ii) poses no danger of ensnaring "an altar boy [who made] an innocent mistake," [*United States v. Harris*, 959 F.2d 246, 259 (D.C. Cir. 1992)] because the government must first prove the defendant is guilty of either drug trafficking or a violent crime, and must further prove that the defendant intentionally used or carried a firearm, or intentionally possessed a firearm, during or in furtherance of that offense. *Id.* There is thus no risk of unfairness because the defendant "knows from the very outset that his planned course of conduct is wrongful." *United States v. Feola,* 420 U.S. 671, 685, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975).

*Id.* at 507. The D.C. Circuit Court further rejected any characterization of its decision as imposing "strict liability", reasoning that "the government is still required to establish *mens rea* with respect to the predicate crime and with respect to the use, carrying, or possession of the firearm." *Id.*; *see also, id.* at 514 (§ 924(c) is not a strict liability crime where "the government is required under this statute to first establish *mens rea* with respect to the predicate offense, and then to prove that the defendant intentionally used, carried, or possessed a firearm in the course of that crime.").

The Court additionally found that:

> the argument that the machinegun provision in § 924(c)(1)(B)(ii) must carry an implicit *mens rea* requirement simply because the [Supreme] Court has construed it as an offense element ignores the practical distinction between proving objective facts and subjective mental states. The kind of weapon used, like the type and quantity of drug, is a physical fact, readily susceptible to proof beyond a reasonable doubt. As such, Congress could well intend such factors to be offense elements without intending to include an implicit, subjective *mens rea* requirement.

*Burwell*, 690 F.3d at 509.

Despite a majority agreement, the D.C. Circuit Court's decision displayed significant fracture in opinion among the judges and was only narrowly reached. Of the eight judges sitting *en banc* in *Burwell*, three judges dissented (Judges Rogers, Kavanaugh, and Tatel). The concurring opinion of a fourth judge called the case "exceedingly close", expressed agreement with several of the dissent's arguments, and ultimately "concur[red] with the majority because of the stability principle inherent in our doctrine of *stare decisis*." *Burwell*, 690 F.3d at 517 (Sentelle, J., concurring).

Judge (now Justice) Kavanaugh, joined by Judge Tatel, dissented from the majority opinion in *Burwell*. This dissent reviewed many of the same Supreme Court cases as the majority, including, but not limited to, *Morissette v. United States*, 342 U.S. 246 (1952), *United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978), *Staples v. United States*, 511 U.S. 600 (1994), *United States v. X-Citement Video, Inc.,* 513 U.S. 64 (1994), *Flores-Figueroa v. United States,* 556 U.S. 646 (2009) and *Dean v. United States,* 556 U.S. 568 (2009). However, Judge Kavanaugh's review of these cases, and other legal precedent, led to a

21

different conclusion. "In its long line of mens rea precedents, the [Supreme] Court has applied the presumption of mens rea not just to statutes that are silent about mens rea. . ., but also to statutes that contain a mens rea requirement for one element but are silent or ambiguous about mens rea for other elements." *Burwell*, 690 F.3d at 535 (Kavanaugh, J., dissenting).

For example, Judge Kavanaugh reasoned that:

Several factors strongly reinforce the presumption of mens rea here. The Supreme Court has emphasized the particular importance of the presumption when penalties are high – a characterization the Court has applied to statutory maximum sentences of one year's imprisonment. Here, the punishment is dramatically more severe than that – 20 extra years of *mandatory* prison time. Under the Supreme Court's precedents, that heavy sanction strongly reinforces the presumption of mens rea. Moreover, the Supreme Court has already applied the presumption to the automatic character of a gun. In *Staples v. United States,* 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), the Court addressed a statute that prohibited possession of an unregistered automatic gun and imposed a maximum sentence of 10 years' imprisonment. The statute was silent about mens rea. The Court held that the Government had to prove that the defendant knew the automatic character of the weapon. There is no good reason for a different result in this case: Here, too, the Government should have to prove that the defendant knew the automatic character of the weapon.

*Id.* at 528. Judge Kavanaugh later repeated the impact of the Supreme Court's decision in *Staples* on how a court should interpret § 924(c):

The Court's decision . . . in [*Staples*], is particularly instructive here. The statute at issue in *Staples* provided only: "It shall be unlawful for any person ... to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record...." 26 U.S.C. § 5861 (1994); *see* 511 U.S. at 605, 114 S.Ct. 1793. The statutory definition of "firearm" included automatic weapons, but not semiautomatic weapons. *See* 511 U.S. at 602-04, 615, 114 S.Ct. 1793. The statute contained no express mens rea requirement.

> The question in *Staples* – very similar to the question in our case – was whether the Government had to prove that the defendant knew the gun was an automatic. The Court said yes. The Court cited "the background rule of the common law favoring *mens rea*" and noted that the rule applies to statutory criminal offenses. *Id.* at 605-06, 619, 114 S.Ct. 1793. According to the Court, "some indication of congressional intent" to dispense with mens rea is necessary before a court will find strict liability. *Id.* at 606, 114 S.Ct. 1793. The Court stated: "Silence does not suggest that Congress dispensed with *mens rea*" for the automatic weapon element. *Id.* at 619, 114 S.Ct. 1793. The Court also pointed out that the sentence involved – a statutory maximum of 10 years' imprisonment – further supported requiring proof of mens rea. *See id.* at 616-19, 114 S.Ct. 1793. As for what *level* of mens rea was required, "knowledge" of "the facts that make his conduct fit the definition of the offense" would suffice "to establish *mens rea*." *Id.* at 608 n. 3, 114 S.Ct. 1793. Therefore, "to obtain a conviction, the Government should have been required to prove that" the defendant "knew of the features of his AR-15 that brought it within the scope of the Act"- that is, knew that the gun was an automatic. *Id.* at 619, 114 S.Ct. 1793.

*Id.* at 535.

Having "established that the presumption of mens rea applies to each element of the offense", Judge Kavanaugh explained that "[t]o use the presumption of mens rea correctly, we must keep in mind a critical distinction: The presumption of mens rea applies to elements of the offense, but *not* to sentencing factors." *Id.* at 538 (emphasis in original). Relying on *O'Brien*'s holding that a firearm's automatic character is an element of the § 924(c) offense, he therefore reasoned that, although the "majority opinion avoids the presumption of mens rea by treating the automatic character of the gun as if it's a sentencing factor rather than an element of the offense", instead, "because the presumption of mens rea applies to each element of the offense, the presumption of mens rea applies

here [and w]e therefore must presume that the Section 924(c) offense requires the Government to prove that the defendant knew his gun was automatic." *Id*. at 541.

Judge Kavanaugh acknowledged that "[o]f course, the presumption of mens rea is a presumption; it thus may be overcome by a plainly contrary congressional intent, as revealed in the statutory text or context" but determined that "[h]ere, the presumption of mens rea is not overcome." *Burwell*, 690 F.3d at 547.

> To begin with, three aspects of Section 924(c) strongly *reinforce* the presumption of mens rea: the severity of the additional sentence for carrying an automatic gun; the difficulty of distinguishing an automatic gun from a semiautomatic gun; and the inconsistency that would otherwise be created with the Supreme Court's decision in *Staples,* which required proof that the defendant knew the gun was automatic in order to convict him of possessing an unregistered automatic weapon.
>
> First, the severe penalties at issue here support requiring proof of the defendant's mens rea. The Supreme Court has repeatedly stated that "the penalty imposed under a statute has been a significant consideration in determining whether the statute should be construed as dispensing with *mens rea.*" *Staples v. United States,* 511 U.S. 600, 616, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). In *X-Citement Video,* the Court said that the "concern with harsh penalties looms equally large respecting § 2252." *United States v. X-Citement Video, Inc.,* 513 U.S. 64, 72, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994). In *U.S. Gypsum,* the Court said: "The severity of these sanctions provides further support for our conclusion that the Sherman Act should not be construed as creating strict-liability crimes." *United States v. U.S. Gypsum Co.,* 438 U.S. 422, 442 n. 18, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). And in *Morissette,* the Court found larceny not to be a strict liability crime in part because "the penalty is high and, when a sufficient amount is involved, the infamy is that of a felony, which, says Maitland, is 'as bad a word as you can give to man or thing.'" *Morissette v. United States,* 342 U.S. 246, 260, 72 S.Ct. 240, 96 L.Ed. 288 (1952) (ellipsis omitted).
> . . .

In this case, the additional imprisonment that turns on the automatic character of the gun is an extra *20 years;* the extra 20 years is a *mandatory minimum;* and the resulting 30-year mandatory minimum sentence for this Section 924(c) offense must be served *consecutively* to (that is, in addition to) the sentence for the underlying robbery. The penalty at issue here is thus dramatically more severe than the penalties in those earlier Supreme Court mens rea cases. In the words of the Supreme Court, the extra 20 years of mandatory, consecutive prison time here is an "extreme sentencing increase." *United States v. O'Brien,* -- U.S. --, 130 S.Ct. 2169, 2178, 176 L.Ed.2d 979 (2010).

Congress could have decided that carrying either a semi-automatic or an automatic gun during a robbery is equally depraved and equally worthy of a 30-year mandatory sentence. Congress did not do so. It believed that carrying an automatic gun is far more serious and depraved, warranting an extra 20 years of mandatory prison time above that for carrying a semi-automatic gun. Almost a fortiori from the Supreme Court's decisions in *Staples, X-Citement Video, U.S. Gypsum,* and *Morissette,* the additional 20 years of mandatory prison time strongly supports requiring proof of mens rea – namely, proof that the defendant knew the automatic character of the gun.

*Second,* the difficulty of distinguishing an automatic gun from a semi-automatic gun supports requiring proof of mens rea. Automatic and semi-automatic guns may appear externally similar if not identical, as the *Staples* Court explained. *See* 511 U.S. at 615, 114 S.Ct. 1793. And "virtually any semiautomatic weapon may be converted, either by internal modification or, in some cases, simply by wear and tear," into an automatic weapon. *Id.* The Supreme Court thus recognized that it is quite possible for someone who possesses an automatic weapon to "genuinely and reasonably" believe that he possesses "a conventional semi-automatic" weapon. *Id.* (citation omitted).

*Third,* requiring proof of mens rea is supported by the Supreme Court's decision in *Staples,* which applied the presumption of mens rea in very similar circumstances. There, the Court considered a statute that criminalized possession of an unregistered automatic gun. The statute contained no express mens rea requirement. The Supreme Court applied the presumption of mens rea and required the Government to prove that the defendant knew that the gun was automatic.

The decision in *Staples* raises a straightforward question: If the presumption of mens rea applied in *Staples* to the gun's automatic character, why shouldn't it

25

also apply *here* to the gun's automatic character? The majority opinion offers no persuasive answer to that question.

. . .

It is of course true, as the majority opinion notes, that "Section 924(c)(1)(B)(ii) is silent regarding a *mens rea* requirement." Maj. Op. at 511. But as the Supreme Court has explained again and again, "mere omission from the statute of any mention of intent will not be construed as eliminating that element from the crimes denounced." *United States v. Bailey,* 444 U.S. 394, 406 n. 6, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980) (quoting *Morissette,* 342 U.S. at 263, 72 S.Ct. 240) (brackets omitted). To state the obvious: If the presumption of mens rea were overcome by statutory silence, it would not be much of a presumption. But the presumption of mens rea is quite potent. Indeed, the Supreme Court has stated that statutes containing no express mens rea requirement still *unambiguously* contain a mens rea requirement. You read that correctly. *See Staples,* 511 U.S. at 619 n. 17, 114 S.Ct. 1793.

*Burwell,* 690 F.3d at 547-549 (emphasis in original).  As Judge Kavanaugh noted in

concluding his dissent:

It's tempting to conclude that Burwell got what he deserved – that carrying a semi-automatic gun during a robbery (as Burwell allegedly believed he was doing) is just as depraved and blameworthy as carrying an automatic gun during a robbery. But neither Congress nor the Supreme Court agrees. Congress deliberately selected 10 years as the mandatory minimum sentence for a person who commits a robbery while carrying a *semi-automatic* gun. And Congress deliberately chose 30 years as the mandatory minimum sentence for a person who commits a robbery while carrying an *automatic* gun. As the Supreme Court explained in *O'Brien*, Congress drew that dramatic distinction because it believed that carrying an automatic gun during the robbery reflected significantly greater moral depravity by the defendant. But that link between the automatic weapon and greater moral depravity does not hold if the defendant actually thought his gun was a semi-automatic.

*Id.* at 553 (emphasis in original).

Judge Rogers, agreeing with "many of the reasons stated by Judge Kavanaugh",

filed a separate dissent.  *Burwell,* 690 F.3d at 519 (Rogers, J., dissenting).  Judge Rogers

26

first opined that the majority erred in following its prior decision in *United States v. Harris,*

decided in 1992, in light of intervening Supreme Court precedent:

> The majority concludes, in applying the doctrine of *stare decisis,* that "Burwell and his amici have failed to establish that *any* intervening legal development has weakened, much less removed, the conceptual underpinnings of *Harris.*" *Ante* at 510 (Brown, J., majority op.) (emphasis added). But the Supreme Court has twice stated that carrying a machinegun involves heightened culpability. *See United States v. O'Brien,* -- U.S. --, 130 S.Ct. 2169, 2178, 176 L.Ed.2d 979 (2010) (stating that "choosing" a machinegun involves "moral depravity"); *Castillo v. United States,* 530 U.S. 120, 126, 120 S.Ct. 2090, 147 L.Ed.2d 94 (2000) ("[T]he difference between carrying, say, a pistol and carrying a machinegun ... is great, both in degree and kind."). Undeniably, our holding in *United States v. Harris,* 959 F.2d 246, 259 (D.C.Cir. 1992), that conviction under 18 U.S.C. § 924(c)(1)(B)(ii) did not require proof of *mens rea,* was premised on the opposite view: "[T]here does not seem to be a significant difference in *mens rea* between a defendant who commits a drug crime using a pistol and one who commits the same crime using a machine gun; the act is different, but the mental state is equally blameworthy," *id. Dicta* or not, *see ante* at 509 (Brown, J., majority op.), the Supreme Court has twice rejected a key basis underlying *Harris's* conclusion that there is no *mens rea* requirement in § 924(c)(1)(B)(ii). *See Patterson v. McLean Credit Union,* 491 U.S. 164, 173, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *see also Montejo v. Louisiana,* 556 U.S. 778, 792-93, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009); D.C. CIR. R. 35(a)(2).

*Id.* Judge Rogers continued:

> Section 924(c)(1)(B)(ii) does not risk criminalizing otherwise innocent conduct in this sense, but the mandated thirty-year minimum, consecutive term of imprisonment means the public welfare exception is inapposite. In the absence of controlling precedent, and given that *Harris's scienter* premise has been rejected, I would hold, . . . that the severe additional punishment mandated by section 924(c)(1)(B)(ii) (magnitudes greater than any of the other statutes considered in the relevant Supreme Court precedent) requires for conviction proof of the defendant's knowledge that the firearm was a machinegun.

*Id.* at 519-520.

Judge Rogers identified three "interpretative rules", derived from Supreme Court precedent, that were also addressed by the *Burwell* majority: (1) that "courts ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element"; (2) "where the statute is silent as to *mens rea,* so the first rule provides no source of a *mens rea* requirement, the Supreme Court has applied a presumption of *mens rea* to avoid criminalizing otherwise innocent conduct"; and (3) "an exception to the background principle disfavoring strict liability crimes for 'public welfare' or 'regulatory' offenses." *Burwell*, 690 F.3d at 520-521.  Although Judge Rodgers recognized that "[t]o date, the three interpretative rules have worked in tandem in Supreme Court precedent to counsel for or against requiring proof of *mens rea*", *id*. at 521, she reasoned that:

> In the case before the court today, the interpretative rules, in their present form, cannot provide the answer to whether the machinegun provision requires proof of *mens rea.* Section 924(c)(1)(B)(ii) has no explicit *mens rea* to "travel" through the subsection, and it does not risk criminalizing "entirely innocent" conduct. Thus neither of these two rules counsel in favor of requiring proof of *mens rea.* But nor do they necessarily require imposition of strict liability either. The narrow exception to the rule favoring proof of *mens rea,* the public welfare offense exception, does not apply – the Supreme Court has concluded that firearm statutes do not fit within the type of crimes contemplated by the public welfare exception, *see Staples,* 511 U.S. at 611-12, 114 S.Ct. 1793, and has suggested that the exception has been generally limited to statutes with minor penalties, *id.* at 616, 618-19, 114 S.Ct. 1793. Section 924(c)(1)(B)(ii) would represent an entirely new category of strict liability for offense elements – one that imposes a sentence magnitudes larger than any of the statutes in the relevant cases the Court has previously considered.

*Id.* at 524-525.

28

Breaking with Judge Kavanaugh's suggestion that "'the presumption of mens rea means that, unless Congress plainly indicates otherwise, the Government must prove the defendant's mens rea for each element of the offense,' . . . regardless of whether that 'element' is anywhere near an explicit *mens rea,* or whether the statute risks criminalizing otherwise innocent conduct", Judge Rogers, relying on *Staples,* opined that "this case can be resolved on a narrower ground":

> The Supreme Court in *Staples* stated that "[h]istorically, the penalty imposed under a statute has been a *significant* consideration in determining whether the statute should be construed as dispensing with *mens rea.*" 511 U.S. at 616, 114 S.Ct. 1793 (emphasis added). Although this statement was made in the context of holding that the public welfare exception was inapplicable, there is no obvious reason to limit the relevance of this consideration to determining whether that exception applies to impose strict liability. If an offense must have a minor punishment to be a public welfare offense, and in so limiting that category the Court was concerned with protecting the background principle disfavoring non-*mens rea* crimes, then the presence of a "severe penalty," *id.* at 618, 114 S.Ct. 1793, should not, without an express statement by Congress, portend a new category of strict liability crimes.

*Id.* at 525.

Judge Rogers thus explained:

> Without deciding how the interpretative rules might unfold in a case with a different statutory punishment, I would take my lead from *Staples* and hold that the mandated thirty-year consecutive term of imprisonment imposed by section 924(c)(1)(B)(ii) is so severe that it outweighs the fact that the conduct prohibited is not otherwise totally innocent. In *O'Brien,* the Supreme Court defined the section 924(c)(1)(B)(ii) offense in terms of the automatic firing characteristic of the firearm, *see* 130 S.Ct. at 2172, given "[t]he immense danger" and "moral depravity in choosing the weapon," *id.* at 2178. Congress has determined that possessing a machinegun "during and in relation to any crime of violence or drug trafficking crime," 18 U.S.C. § 924(c)(1)(A), warrants twenty years' additional imprisonment over such possession of a semi-automatic assault

weapon, *compare id.* § 924(c)(1)(B)(i), *with id.* § 924(c)(1)(B)(ii). A leading commenter has observed that the hostility to strict liability for crimes protects a defendant "unaware of the *magnitude* of the wrong he is doing," Wayne R. LaFave, Criminal Law 304 (5th ed.2010) (emphasis added); *see post* at 543 (Kavanaugh, J., dissenting); *ante* at 516-17 (Sentelle, C.J., concurring) ("I do not think it good enough to posit that someone should know conduct is illegal and therefore avoid it where the illegality of the conduct may be measured in degrees."). The Court's observation in *Staples,* 511 U.S. at 614-15, 114 S.Ct. 1793, is directly on point: "The Government does not dispute ... that virtually any semiautomatic weapon may be converted ... into a machinegun.... Such a gun may give no externally visible indication that it is fully automatic. But in the Government's view, any person ... can be subject to imprisonment, despite absolute ignorance of the gun's firing capabilities, if the gun turns out to be automatic." (internal citations omitted). For punishment, then, of an additional twenty-years' imprisonment for possessing an automatic, rather than a semi-automatic, firearm, neither silence, nor mere use of a passive voice or the meaning of surrounding provisions, *see Dean,* 556 U.S. at 572-74, 129 S.Ct. 1849, are sufficient to rebut the traditional *mens rea* requirement for criminal offenses, and the Government must prove a defendant knew the firearm he possessed was a machinegun in order to obtain a conviction under section 924(c)(1)(B)(ii).

*Id.* at 526.

In contrast to the Eleventh Circuit's opinion and the majority's opinion in the D.C. Circuit, in 2023, the First Circuit in *United States v. Pérez-Greaux* held that the Government is required to prove, beyond a reasonable doubt, that the defendant knew the firearm that he possessed had the characteristics of a machinegun. In reaching this conclusion, the Circuit framed the relevant question as follows: "Did Congress intend to make a conviction for the possession of a machinegun under § 924(c)(1)(B)(ii) a strict liability crime?" *Pérez-Greaux*, 83 F.4th at 13. The First Circuit acknowledged the holdings of the Circuit Courts in *Haile* and *Burwell*, but disagreed with their reasoning and holdings.

30

The First Circuit found "no explicit expression of congressional intent as to mens rea within the plain meaning of" § 924(c) and determined that the legislative history and statutory structure to determine congressional intent provided no guidance. *Pérez-Greaux*, 83 F.4th at 14-15. The Circuit Court thus turned to "the Supreme Court's treatment of mens rea", acknowledging that "the Supreme Court's jurisprudence on the precise issue that we confront is unsettled" but stating that the Circuit Court's decision "is in line with the [Supreme] Court's case law, as well as with the recognized principles of proportionality (given the thirty-year mandatory minimum imposed by the statute), which animates the Supreme Court's mens rea analysis." *Id.* at 15.

Following a review of applicable Supreme Court precedent, the *Pérez-Greaux* Court reasoned that the Supreme Court's decision in *O'Brien* "eliminated the underlying assumption that other circuits had previously relied on to justify excluding a mens rea requirement from possession of a machinegun: that subsection (c)(1)(B)(ii) was a sentencing factor that did not require evidence of mens rea." *Id.* at 16. The Circuit recognized that "*O'Brien* left open whether the government needed to prove that the defendant knew that the firearm in question included the characteristics relevant to the section charged", but nonetheless reasoned that "because mens rea presumptively applies to elements of a crime and because the Supreme Court determined that the automatic character of a firearm is an element of the offense, rather than a sentencing factor, it only follows that § 924(c)(1)(B)(ii) is subject to the mens rea presumption." *Id.* at 17.

31

Presumably relying on the reasoning set forth by the D.C. Circuit in *Burwell*, the Government in *Pérez-Greaux* asserted that the presumption of mens rea was "inapplicable to § 924(c)(1)(B)(ii) because this statute includes the predicate crime of either drug trafficking or a crime of violence and 'does not punish conduct that would otherwise be innocent.'" *Pérez-Greaux*, 83 F.4th at 17.  The First Circuit disagreed with this assertion for a number of reasons, including: (1) that "[t]he Supreme Court has indeed applied the presumption to cases where a statute criminalizes otherwise innocent conduct" and "[t]he Court has also often emphasized scienter's importance in separating wrongful from innocent acts"; (2) "it does not necessarily follow that the presumption [of mens rea] only applies [if there is no predicate crime] and nowhere else"; and (3) "the Supreme Court has not explicitly articulated a rule dictating that the presumption will only apply where innocent conduct is at stake. Instead, the Court has repeatedly stated that criminal offenses that dispense with a mens rea requirement are 'disfavored.'" *Id*. at 17-18 (underlines in original). Further, "[d]oing away with the defendant's knowledge of the characteristics of the firearm would make possessing a machinegun a strict liability crime, which would eliminate the longstanding 'concurrence of an evil-meaning mind with an evil-doing hand.'" *Id*. at 18 (quoting *Morissette*, 342 U.S. at 251).

The First Circuit, having determined that the *mens rea* presumption applied to the machinegun element of § 924(c), took the further action of "ask[ing] whether there is some specific indication from Congress that it should not apply to § 924(c)(1)(B)(ii)." *Pérez-*

*Greaux*, 83 F.4th at 18.  The Court found "no indication here that Congress sought to take the extraordinary step of making § 924(c)(1)(B)(ii) a strict liability offense."  *Id*.

Underlying the First Circuit's detailed legal reasoning was the Court's clear reticence, based on principles of fairness and equity, and supported by Supreme Court precedent, to require the imposition of a mandatory minimum sentence of 30-years in the absence of proof beyond a reasonable doubt that the defendant knew the firearm at issue was a machinegun.  *See e.g., Pérez-Greaux*, 83 F.4th at 20 ("Because a minimum of thirty years hang in the balance for defendants charged with § 924(c)(1)(B)(ii), it does not make sense that Congress would impose such a draconian sentence for a crime and not hold the government to the burden of proving knowledge of the specific characteristics of the firearm that make the defendant culpable under that particular section. Common sense and the above-referenced cases indicate that Congress could not have intended a strict liability crime for a crime with a thirty-year sentence attached."); *id*. ("But where thirty years are at stake, holding the government to its burden of establishing the defendant's knowledge beyond a reasonable doubt is paramount to maintaining our understanding of the choice between good and evil. Holding otherwise would mean that a defendant can be subject to an additional thirty years' imprisonment, despite absolute ignorance of the gun's firing capabilities, if the gun used in a crime of violence or drug trafficking offense turns out to be an automatic.  And we know that ignorance is indeed possible since virtually any semiautomatic weapon may be converted, either by internal modification or, in some cases,

33

simply by wear and tear, into a machinegun.") (internal quotation marks, citations, and brackets omitted).  *See also*, *id*. at 15 ("While the Supreme Court's jurisprudence on the precise issue that we confront is unsettled, our decision . . . is in line with the Court's case law, as well as with the recognized principles of proportionality (given the thirty-year mandatory minimum imposed by the statute), which animates the Supreme Court's mens rea analysis."); *id*. at 18 ("Merely because a defendant has already engaged in wrongdoing does not mean that the government should not be held to the burden of demonstrating that the defendant consciously chose between two distinct types of firearms. Why should this underlying offense trigger an additional thirty years when Congress punished that conduct elsewhere? In other words, while a § 924(c)(1)(B)(ii) defendant might be guilty of the predicate offense -- that is, possession of a firearm in furtherance of a crime of violence or drug trafficking crime -- we see no logic in dispensing with the requirement of a vicious will for the second offense where the only additional element is that the firearm is a machinegun. This is particularly true where the type of firearm chosen can potentially result in a sixfold sentencing increase.").

Here, this Court finds unpersuasive the reasonings set forth by the Eleventh Circuit and the D.C. Circuit in its majority opinion.  In addition, as correctly noted by the First Circuit, both the Eleventh Circuit and D.C. Circuit's decisions "were based, in large part, on [that] circuit's precedent", *see Pérez-Greaux*, 83 F.4th at 21, all of which was established prior to *O'Brien*.  This Court is not bound by such precedent and, where the Third Circuit

34

has not decided the issue of whether there is a *mens rea* requirement as to §

924(c)(1)(B)(ii) or even suggested in *dicta* any agreement with the Eleventh Circuit or D.C.

Circuit's opinions in *Haile* or *Burwell*, this Court is not required to afford deference to the

decisions of those Circuit Courts.  Rather, this Court finds Judges Kavanaugh and Rogers'

analyses and applications of the relevant Supreme Court case law, as well as that set forth

by the First Circuit, to be the stronger and better reasoned applications of Supreme Court

precedent in light of its decision in *O'Brien*.

At trial, this Court followed the Third Circuit Model Jury Instructions and Third Circuit

case law in setting forth the jury instructions and verdict form.  Those proposed Third Circuit

instructions, and their accompanying Commentary, do not address or reference the

presence, or lack thereof, of a *mens rea* requirement as to a machinegun, nor has the Third

Circuit directly addressed this issue in any precedential opinion.  Notwithstanding the lack of

legal authority in this Circuit, upon review of the Supreme Court's opinion in *O'Brien* and the

law as it has developed in other Circuits since *O'Brien*, and in particular the dissenting

opinions of Judge Kavanaugh and Judge Rodgers in *Burwell*, which are largely paralleled

by the First Circuit's reasoning in *Pérez-Greaux*, this Court has independently determined

that § 924(c)(1)(B)(ii) contains an implicit *mens rea* requirement necessitating that the

Government prove beyond a reasonable doubt that the defendant knew the firearm that was

possessed in relation to the crime of violence had the characteristics of a machinegun.

35

Where the jury in this case was not properly instructed as to the need to determine whether Defendant Wong had knowledge of the characteristics of the firearm, specifically, whether it was a machinegun, this Court must address whether this error was harmless. *See Neder v. United States*, 527 U.S. 1, 15 (1999) (holding that omission of an element in a jury instruction is subject to harmless-error analysis). "The harmless-error standard is the converse of the insufficient evidence standard." *United States v. Zayas*, 32 F.4th 211, 225 (3d Cir. 2022). "A district court's failure to instruct the jury on an element of the offense will be harmless error if, based on the evidence, no reasonable jury could find that the element was not present. However, if the record contains 'evidence that could rationally lead to a contrary finding with respect to the omitted element,' the error is not harmless." *United States v. Andrews*, 681 F.3d 509, 527 (3d Cir. 2012) (citing *Neder*, 527 U.S. at 18-19). *See also*, *Neder*, 527 U.S. at 19 ("safeguarding the jury guarantee will often require that a reviewing court conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error – for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding – it should not find the error harmless.").

Here, this Court cannot say that no reasonable jury could find that Wong did not know that one of the firearms used during the August 30, 2020, robbery or the September 14, 2020, robbery was a machinegun. The error was therefore not harmless. The

Government, through its expert witness, ATF Firearms Officer Anthony Ciravolo, undoubtedly presented sufficient evidence to establish beyond a reasonable doubt that one of the firearms used at both robberies was a machinegun, a fact that Wong does not dispute in his motion. However, the Government offered only limited and circumstantial evidence as to Wong's knowledge of the characteristics of the firearm which rendered it a machinegun and Defendant, through cross-examination of several witnesses, elicited sufficient testimony that could support a successful defense by Wong at trial that he was unaware of the firearm's characteristics.[8]

Preliminarily, Officer Ciravolo, who was admitted as an expert in Firearm Identification Operation, testified as to his examination of the machinegun at issue in this case, identified by Officer Ciravolo as "an AR-type weapon that was chambered in the 300 Blackout." (Trial Tr., Test. of Ciravolo, June 14, 2024, at 192-193). Officer Ciravolo testified as follows with respect to his findings related to the gun he examined:

- "[T]he first thing that I noticed was there were no markings on the firearm, and, then, the second thing I noticed was that the automatic sear pin was present."

- The automatic sear pin on the firearm "is a pinhole above the safety selector on the receiver that is right above the grip, and that pin, in and of itself, is a determining

---

[8] Due to the varying word choices of witnesses at trial in describing the machinegun, throughout this memorandum opinion, the machinegun at issue is referred to as an "AR-15", "ARP", and "rifle".

factor about whether or not this is a machine gun receiver, so it tells me that I'm looking at what is a machine gun."

- "The only purpose for [the automatic sear] pin to be there is to house the automatic sear, and the presence of the holes, alone, of that pin tell you that this is the receiver of the machine gun."

- "On the left side [of the machinegun], we're looking at the left side of the receiver, at the safety selector, and we can see the markings that are on the safe and fire position, which appear to be hand-marked, and, then, directly above that, what we're looking at is the automatic sear pin, and you can see there's a vertical and horizontal white line there indicating where the hole should be marked to be drilled."

- The firearm had three modes of fire: "[t]here are two modes of fire that are marked as S, for safe, and F, for fire, but there are, actually, three modes of fire for this. The firearm is equipped with all of the appropriate M16-type three-round burst components, and that will allow the weapon to be placed into the safe, semi-automatic, and then the automatic position."

- Following a "manual function test" wherein Officer Ciravolo "separated the upper assembly from the receiver to examine the fire control components of it to see what firearm parts it was assembled with", he determined two "notable things": "one, that the interior of the cavity is what's known as, in the light, you see -- in the white, you see the raw silver aluminum that is free of any coating, that tells you that that was

38

drilled out after this item was produced. And the other thing is the automatic sear, which I'm circling now (indicating), and, then, on the lower picture, where the hammer is in the forward position, we see the two disconnectors of the three-round burst components."

- Officer Ciravolo performed a functionality test which included manually cycling the firearm and noted that "[d]uring my manual cycling of the firearm, I noted that the burst cam did not seem to be working, at all, and the firearm, in the automatic position, was only functioning as a full automatic."

- Having determined that the firearm was safe to fire, Officer Ciravolo tested it. He explained:

> With our test fires, we will start off with just shooting one round, so we will place one round in it, put it on fire, on semi-automatic, and pull the trigger. I'll, then, examine that brass case to see if there's any signs of head space issues or any reason that the brass would be, visually, telling me that the weapon is unsafe to shoot.
>
> From there, I place two rounds in the weapon and shoot it in the semi-automatic setting, and when I did that, the weapon fired upon the release of the trigger, which is uncommon for something like this. I did that test, again, and I achieved the same result.
>
> Because it was firing on the release of the trigger, I then placed three rounds in the firearm on the semi-automatic position, and when I did that, it fired one round on the pull of the trigger, and upon the release of the trigger, it fired two rounds, automatically.
>
> After that, I placed the weapon in the automatic position and I loaded two rounds in. The firearm fired two rounds, automatically, by a single function of the trigger, and I then moved on to five rounds, and the weapon shot all

five rounds, automatically, by a single function of the trigger, and I did that one additional time.

(*Id.* at 195-203).

Although Officer Ciravolo provided ample testimony that the firearm that he examined was a machinegun, he also testified that the firearm was privately made (a "ghost gun") and admitted that he did not know when the firearm was made to be fully automatic. (*Id.* at 203-204). On cross-examination, Officer Ciravolo explained:

Q. Let's put it this way. [The firearm] has the capability, depending on how it's modified or what's done to it, to be, either, a semi-automatic or an automatic machine gun; correct?

A. Correct.

Q. What you indicated was, you showed scratches and things inside that gun showing where holes would be drilled, which is how you would make it automatic; correct?

A. Yes.

Q. So this gun may have started off as a complete semi-automatic firearm; correct?

A. That's possible.

Q. And if and when, in fact, it was modified into a machine gun, you have no idea?

A. That is correct.

Q. And, in fact, it could have been the day before the Government seized it in this case; correct?

A. Yes.

40

Q. You'd agree with me that, you know, looking at it, to the naked eye, without looking at what you did close up on the gun, it's consistent with a semi-automatic weapon?

A. I believe that would be based on your level of knowledge. From here, I can see the automatic sear pin, and that would immediately tell me that it's a machine gun.

. . . .

Q. To a layperson, it's not readily differentiable between a semi-automatic and automatic; correct?

A. I believe that it depends. So it would depend on your level of knowledge of firearms. So there's a mystical thing that everyone refers to as the third pin of the AR, and that third pin is always in reference to the automatic sear pin. Anyone who has really any of experience with AR-type firearms or who has been involved in shooting or any of the firearms community stuff would know that the third pin is in reference to that and would know the location of it. So it's really impossible for me to say what another person would or would not know, based on the outward appearance of it, because the automatic sear spin is such an indicative thing of a machine gun.

(*Id.* at 205-207). With respect to whether a lay person could determine that the firearm was a machinegun based solely on its appearance, Officer Ciravolo further testified on cross-examination:

Q. As you said, when I asked you about what a layperson would see or know, this small hole, right there (indicating), that pin, that is, from the outside, is what differentiates it as from a machine gun and a semi-automatic; correct?

A. Yes, if we're talking about manufactured AR or M16 or M4 types, there's, also, conversion devices that would be internal that you would not be able to tell. But for outward appearances, yes, that would be the way to tell, correct.

. . . .

Q. This one small point that my finger is pointing to is the only thing, if you did fire it, that would tell you it's a machine gun and not a lawful semi-automatic weapon?

41

A. Externally, yes.

(Trial Tr., Test. of Ciravolo, June 14, 2024, at 207). Officer Ciravolo's testimony thus undisputedly established that the firearm at issue was a machinegun but created issues as to when the firearm became a machinegun and whether Wong had the necessary level of knowledge to identify the firearm as a machinegun.

At trial, Alarick Batista also testified on behalf of the Government. Batista had previously pleaded guilty in related criminal case 3:21-cr-271 to Count 1 of the Superseding Indictment in that case, charging the defendants with Conspiracy to Interfere with Commerce by Robbery "[i]n August of 2020, and continuing to on or about August 30, 2020." In relevant part at trial, Batista testified as to his membership in the Infamous Ryders Motorcycle Club, his involvement in both the attempted robbery on August 29, 2020, and the robbery on August 30, 2020, and his relationship with Wong prior to these robberies.

In mid-2020, Batista moved into a house with Joushton Rodriguez on Sillyman Street, in Cressona, which was owned by Wong and which was also located next to Wong's home. (Trial Tr., Test. of Batista, June 12, 2024, at 167-169). Batista testified that, after moving into the house on Sillyman Street, he saw Wong "[a]lmost every day" and that Wong "always" carried a Hellcat handgun on him and that he also carried a Glock (*id*. at 170-171). Batista also saw Joushton Rodriguez with "the Hellcat or the black Glock, also a silver handgun" and an ARP "rifle". (*Id*. at 172).

42

With respect to the ARP, Batista stated that prior to moving into the Sillyman Street house, he was visiting Joushton Rodriguez and saw "Uncle Charlie" and another man selling the firearm to Joushton Rodriguez. (*Id*. at 172-173). On direct examination, Batista testified:

> Q. Who was counting money and making a transaction happen? You named Uncle Charlie, and who else did you know?
>
> A. The other man that I don't know of was helping Uncle Charlie count the money.
>
> Q. Who else was there then?
>
> A. It was Joushton Rodriguez.
>
> Q. Was he doing the transaction?
>
> A. Yes.
>
> Q. While you were there, did you notice anything about that firearm?
>
> A. He opened the top half of the rifle and he showed an engravement, kind of like if it was drilled out.
>
> Q. And did you talk to Joushton Rodriguez about the gun?
>
> A. I didn't talk to him about it, but he talked to me about it.
>
> Q. And what did he say to you about it?
>
> A. He was like, we got this gun now and –
>
> . . .
>
> A. So they explained on the mechanism of the weapon and how it works. He loaded it and unloaded it and showed how to work it.

Q. And did Joushton explain any particular difference in this gun than a regular gun?

A. It was stated that it was a fully automatic rifle.

(Trial Tr., Test. of Batista, June 12, 2024, at 173-174). Batista confirmed that this firearm was purchased prior to the August robberies, but at a time after he had met Wong. (*Id.* at 174-175).

On cross-examination, Wong's counsel further questioned Batista about the circumstances surrounding Joushton Rodriguez's purchase of the ARP:

Q. . . . So here's one thing I want to understand. We have heard a lot about the AR-15, but that was the gun that you held up there in front of the jurors. Do you recall that?

A. Yes.

Q. But the AR-15, we can agree, I think even by your testimony, is used in the robberies on August 29th and August 30th, correct?

A. Yes.

Q. And the AR-15 is the weapon, according to you, that is purchased on the street, correct?

A. I was there when it was purchased.

Q. And you were friends with an individual by the name of Bam-Bam, correct?

A. Yes.

Q. Joushton Rodriguez, correct?

A. Yes.

Q. And you were friends with him way before Steven Wong, correct?

44

A. Yes.

Q. And the type of people you hung out with were guys that purchased, according to you, machine guns off the street, correct?

A. That's not what Joushton Rodriguez was doing at the time.

Q. So tell me, I mean, was he deer hunting? Tell me, why do you purchase a machine gun off the street unless you're the type of person that plans to do these type of crimes?

A. I just happened to be selling drugs and smoking a lot of weed and I happened to be at his house. I didn't plan to be at his house and say, yo, we're going to buy a rifle today. That's not what went down. I was walking down the stairs -- like I said, I used to sell drugs, and so I was in and out of that house like no tomorrow, and I wouldn't even say hi and bye to these people. It was just in and out, just like a trap house. I didn't know what Joushton was doing. I just walked down and that transaction was occurring.

Q. So what you're going to have trouble explaining, though, Mr. Batista, isn't it that when you come up to the area and you're living with your cousin, Eric LaSalle, right, that AR-15, we have pictures of you in the house with it, right?

A. I don't remember. I don't recall.

Q. Well, let me ask you under oath. You're still under oath, do you understand that? That AR-15, the machine gun that was utilized to commit violent crimes, first of all, wasn't purchased by Steven Wong, correct?

A. He was -- he ordered Joushton Rodriguez to bring a rifle.

Q. You're not answering my question. I understand what you're saying. I'm asking you a question. The first time you see that gun is at a time that you don't know Steven Wong, Bam-Bam doesn't know Steven Wong, and it's purchased off the street, an AR-15, correct?

A. We knew Steven Wong, and that was ordered by Steven Wong to purchase the rifle and, like I said, that's how it happened.

45

Q. We're going to go back over this, okay? I'm sorry. But you told me you were walking at the bottom of the steps, right? Do you recall that testimony?

A. Um-hum.

Q. And you heard some transaction between a guy by the name of Uncle Charlie and Joushton Rodriguez, correct?

A. Yes.

Q. And that was at a time you did not know Steven Wong, correct?

A. We did know Steven Wong.

Q. You did know him?

A. After.

Q. After the gun was purchased off the street, correct?

A. We were -- like, I didn't really know -- like, I didn't see him --
. . . .

A. It's hard for me to remember. It's honestly really hard for me to remember.
. . . .

Q. So my recollection of your testimony, and maybe we can break this down a little bit, is that it was at a time that you lived in Allentown, right?

A. But I said that I was going back and forth from Allentown to Schuylkill County.

Q. So at the time that the AR-15 is purchased, am I to understand your testimony that you're not sure whether or not you knew Mr. Wong at that time?

A. We knew Steven Wong at that time.

Q. Can you give me a time of year this AR-15 was purchased?

A. It was literally several weeks before that robbery, but I can't remember quite so good.

46

Q. So are you now saying that Steven Wong directed Joushton Rodriguez to purchase that firearm?

A. I know Joushton Rodriguez and Steven Wong talked at the time.

Q. I want to talk about the purchase of the AR-15.

A. That's what I'm saying, like, they knew each other at that time, but were they hanging out faithfully every day? No. They used to text, you know what I mean? They used to call.

(*Id.* at 206-210).

With respect to the August 29, 2020, attempted robbery in Schuylkill Haven, Batista

testified as follows:[9]

Steven Wong said I'm driving. He told Joushton Rodriguez to go in with the rifle. He told Cornelius -- excuse me -- Solomon Rodriguez to go in with the gun. I forgot who went in with the knife and a gun, but they had a knife and a gun on them. We were directed to drive to this address in Schuylkill Haven by Steven Wong.

(*Id.* at 179).  Batista stated that he drove himself and others to the address provided to him

and parked in an alleyway.  When asked what firearms the other individuals in the car had,

Batista responded:

Q. And do you remember which gun Joushton Rodriguez had?

A. He had the Hellcat.

Q. And do you remember what other guns were there?

---

[9] Counts 4 and 5, charging violations of § 924(c), relate to the robberies of August 30, 2020, and September 14, 2020.  However, the events leading up to these robberies, as well as the events of the attempted robbery on August 29, 2020, are relevant to a determination of whether Wong knew that one of the firearms used on August 30 and September 14 was a machinegun.

A. The ARP.

Q. And is that the ARP that was purchased that you talked about that was a machine gun?

A. Yes.

Q. And you're not sure who had that? It's okay if you can't remember.

A. I seen Joushton Rodriguez go out the vehicle with the rifle -- well, excuse me. Cornelius Green had the rifle and Joushton Rodriguez had the handgun on him.

(*Id.* at 180-181).

With respect to the August 30, 2020, robbery of Joseph Lumia in Mahanoy City, Batista testified that, on that day, he was at either Wong's house or his own house next door, with Wong, Joshua Marsh, and Solomon Rodriguez and that Marsh provided Wong with an address to rob. (Trial Tr., Test. of Batista, June 12, 2024, at 186-187). Wong instructed Batista that he and Eric LaSalle would be the drivers for the robbery.

Q. So then who all left to go to do this robbery that you can remember?

A. Like I said, it was me driving, Solomon Rodriguez in the passenger's seat, Joushton Rodriguez in the back, Joshua Marsh in back, and Eric LaSalle was driving the Jeep Wrangler.

Q. Before you left Sillyman Street, did you see any firearms?

A. Yes.

Q. What did you see that you can remember?

A. I seen an ARP.

Q. Is that the ARP that I showed you as a Government's exhibit?

A. Correct. I seen a black Hellcat that was registered under Odie, I seen the -- it was the Glock, the black Glock, and then there was a silver handgun that was utilized as well, and also a knife.

Q. And did they have those firearms and weapons when they got into the van and into the Jeep?

A. Yes.

(*Id.* at 188-189). Batista later testified twice that Joushton Rodriguez had the ARP during the robbery. (*See id.* at 192 ("Joushton Rodriguez was the one that went in with the rifle"); *id.* at 193 (watching surveillance video of the robbery and identifying Joushton Rodriguez as the person "holding the ARP")).

When further questioned on cross-examination about the ARP, Batista explained that the firearm "was at Eric [LaSalle]'s house, and then it went to Steven Wong's house because that's what was told – that's what he told Joushton Rodriguez to do." (*Id.* at 216).

Eric LaSalle, who also pleaded guilty in related criminal case 3:21-cr-271 to Count 1 of the Superseding Indictment, charging him with Conspiracy to Interfere with Commerce by Robbery, also testified at Wong and Solomon Rodriguez's trial.

LaSalle testified that during the summer of 2020, he had seen Wong with firearms, including a "Glock 40, Hellcat 9", and others that he could not remember. (Trial Tr., Test. of LaSalle, June 13, 2024, at 153). He also saw other members of the Infamous Ryders Motorcycle Club, including Solomon Rodriguez, Joushton Rodriguez, Cornelious Green, and Alarick Batista, with firearms. (*Id.*). With respect to the ARP, LaSalle testified that he

49

had seen that firearm "around the guys", had seen Batista and Joushton Rodriguez in possession of the firearm, and that he had personally handled the weapon. Batista and Joushton Rodriguez told him that it shot "a burst." (*Id.* at 154). LaSalle did not remember whether he had ever seen Wong with the ARP. (*Id.*).

LaSalle testified as to his role in the August 30, 2020, robbery in Mahanoy City. LaSalle explained that he was at Wong's house that day and Wong informed him that he would be a "decoy" driver while other individuals went into the home to commit the robbery for money and drugs. (Trial Tr., Test. of LaSalle, June 13, 2024, at 157-158).

> A. [Wong] said that I was just going to be a driver and it would be quick and then I could go home afterwards.
>
> Q. What car were you assigned to drive?
>
> A. I was driving Alarick's Jeep Wrangler.
>
> Q. Were there any other cars that were involved?
>
> A. Yes. There was a minivan, Solomon Rodriguez's minivan that Alarick Batista was driving with Joushton Rodriguez, Solomon, Alarick, and Marsh.
>
> Q. Before you left, did you see any firearms at Steven Wong's house that night?
>
> A. Yes.
>
> Q. What type of firearms?
>
> A. AR pistol, the Glock 40, the Hellcat 9.
>
> Q. This AR pistol, the one that you just held up, Government's 4.3?
>
> A. Yes.

50

Q. Who had that?

A. Joushton Rodriguez.

Q. Who had the other firearms?

A. Solomon Rodriguez. I don't know what he had, what kind of gun it was, but I'm sure it was either the Glock or the .9 millimeter.

Q. Was Steven Wong in the same room with you all when you saw these guns?

A. Yes.

(*Id.* at 158-159).

LaSalle further addressed the ARP on cross-examination by counsel for Wong:

Q. I'm just going to wrap up with, this gun, the one that's been up there next to you the entire time, I think, there's a couple things we can agree upon with this gun, after you just said you had minimal involvement in Steven Wong's activities, okay. This gun is the gun there; correct?

A. Correct.

Q. It's in your possession in that picture on the 25th of August; correct?

A. Correct.

Q. There's a robbery on the 29th of August; correct?

A. Correct.

Q. After the robbery on the 29th of August, this gun is back in your house?

A. I didn't own the gun, Alarick Batista was living with me and brought it to my house.

Q. That's what I asked you, it was back in your house; correct?

A. Yes.

Q. So before, during and after the offense, it's in your house, but Steven Wong distributes all the firearms?

A. He has his wife buy them for him and he distributes them to whoever he needs.

(Trial Tr., Test. of LaSalle, June 14, 2024, at 69-70).

Defendants Wong and Solomon Rodriguez also each testified in their own defense at trial.

Defendant Wong's testimony demonstrated that he had, at minimum, some knowledge of firearms. At trial, the Government introduced a surveillance video of Wong handling, and purchasing, several firearms at Schuylkill Gun Works on July 1, 2020, and Wong admitted that he (through his wife) purchased three firearms at that store, specifically, a Smith & Wesson, a Glock, and an Armory Hellcat (Trial Tr., Test. of Wong, June 18, 2024, at 133, 175). Although Wong testified that he looked at "long guns" in the store, he stated that he never owned any long guns, rifles, machine guns, or semi-automatic weapons, and that he did not purchase any that day because the gun store employee he was speaking with told him those weapons were "not good for" his business or home. (*Id.* at 134).

With respect to the ARP at issue in this case, Wong testified that he did not ever touch or possess that gun. However, when asked if he "ever [handed] it out", Wong was evasive in simply stating that he "never touched that gun". (Trial Tr., Test. of Wong, June 18, 2024, at 134-135). When asked if he had ever seen the firearm prior to trial, Wong

52

responded: "Have I seen it? I ain't gonna sit here and lie. I could have saw him[10] carrying it, for all I know, so for me to sit here and play the lie game, I'm not doing that." (*Id.* at 135).

At trial, Solomon Rodriguez testified that he "didn't purchase not a single firearm", never had them in his possession, and never used them. (Trial Tr., Test. of S. Rodriguez, June 18, 2024, at 223). However, he admitted that he knew about firearms being used to protect Wong's club, Dubai. (*Id.*). Although Solomon Rodriguez admitted to having seen Wong in possession of a firearm in his home, he testified that he was "not familiar with firearms" and therefore could not say what firearms were at Wong's home. (*Id.* at 228). He also stated that he had previously seen Cornelius Green with a handgun. (*Id.* at 225).

With respect to the machinegun, Solomon Rodriguez identified the firearm held by Cornelius Green in the video of the September 14, 2020, robbery as an AR-15 and testified that he had previously seen Joushton Rodriguez with this AR-15 "in the house in Sillyman." (Trial Tr., Test. of S. Rodriguez, June 18, 2024, at 227). After identifying the AR-15 possessed by Joushton Rodriguez during the robbery on August 30, 2020, from surveillance video of the incident, Solomon Rodriguez admitted that this same firearm was the one that he saw in one of Wong's town homes prior to that date. (*Id.* at 231; *see also*, *id.* at 241). Solomon Rodriguez testified that he had seen Joushton Rodriguez, Batista, and LaSalle in

---

[10] It is unclear to whom Wong was referring when he said that he "could have saw him carrying" the ARP.

possession of the AR-15, but had never seen Wong in possession of this firearm. (*Id*. at 245).

Based on the testimony and evidence presented at Wong's trial with respect to his knowledge of the characteristics of the machinegun, the court cannot conclude beyond a reasonable doubt that the jury verdict with respect to the § 924(c)(1)(B)(ii) charge would have been the same if the jury had been instructed as to the *mens rea* requirement.

Here, Officer Ciravolo testified that the firearm he was asked to examine was a machinegun and explained to the jury the basis of his findings and the specific characteristics of the firearm which rendered it a machinegun. However, he also admitted that a small hole on the firearm was, from the outside, the only thing that differentiated the firearm as a machinegun from a semi-automatic gun and that it was "impossible . . . to say what another person would or would not know [as to whether the firearm was a machinegun], based on the outward appearance of" the machinegun at issue because it would "depend on [the individual's] level of knowledge of firearms" (Trial Tr., Test. of Ciravolo, June 14, 2024, at 206-207). At trial, Wong himself admitted to a basic familiarity with firearms and that he had previously handled firearms, and Batista, LaSalle, and Solomon Rodriguez each testified that they had seen Wong in possession of one or more firearms on multiple occasions. However, this testimony did not provide significant evidence to support a finding, beyond of reasonable doubt, that Wong had the requisite level of

knowledge of firearms that he would recognize, based solely on the firearm's outward appearance, that the firearm was a machinegun.

In addition, the testimony and evidence as to Wong's possession of the machinegun and knowledge of its characteristics, regardless of his actual possession of the firearm, was thin and equivocal in so far as it could have rationally resulted in a finding by the jury that the Government had not produced sufficient evidence to establish the necessary *mens rea* element. Batista testified that Joushton Rodriguez had purchased the firearm and was the person who informed him that it was an automatic firearm. Batista further testified that during the robberies in which he was involved, he had seen Joushton Rodriguez and Cornelius Green in possession of the ARP. LaSalle testified that, although he had seen Wong with several firearms, he did not remember ever seeing Wong in possession of the ARP. He also stated that he had seen Batista and Joushton Rodriguez in possession of the ARP and that it was Joushton Rodriguez who had told him that it shot "a burst." Similarly, Solomon Rodriguez testified that he had seen Joushton Rodriguez, Batista, and LaSalle in possession of the ARP, but had never seen Wong in possession of this firearm. The Government adduced no evidence that any person had told Wong that the firearm at issue was a machinegun, that they heard Wong refer to the weapon as a machinegun or automatic firearm, or that Wong ever fired the weapon, or had seen or heard the weapon be fired, such that he would be aware of its capabilities.

55

Nonetheless, as will be discussed, *infra*, in addressing Defendant's sufficiency of the evidence argument, the Government did produce evidence which, if believed, *could* lead a reasonable jury to find that Wong was aware that one of the firearms used during the robberies of August 30, 2020, and September 14, 2020, was a machinegun. However, this evidence is insufficient for this Court to conclude beyond a reasonable doubt that the jury verdict would have been the same if the jury had been instructed as to the *mens rea* requirement with respect to the § 924(c)(1)(B)(ii) charge. The absence of this instruction was therefore not harmless error and Defendant's motion for a new trial will be granted as limited herein.[11]

---

[11] The Government argues that Wong was "found guilty of [Counts 4 and 5] under multiple theories of liability which . . . obviate the need to show the defendant affirmatively knew the firearm in question was a machinegun, namely accomplice liability under 18 U.S.C. § 2, and *Pinkerton* liability." (Doc. 256, at 49). This argument incorrectly assumes that if the jury could have found Wong guilty under *any* of the theories of liability presented at trial as to Counts 4 and 5, then the omission of the *mens rea* instruction regarding the machinegun is harmless. Here, the jury was instructed as to the three theories of liability under which it could find the defendant guilty for Counts 4 and 5: (1) personal commission of the offense; (2) *Pinkerton* liability; or (3) aiding and abetting the offense. Because the verdict form did not ask the jury which theory of liability under which it found Wong guilty of those counts, to find that the error in not providing the jury with a *mens rea* instruction as to the machinegun element was harmless, this Court would have to determine that the jury verdict as to Jury Interrogatories 4.2 and 5.2 would have been the same absent the error under *each* theory of liability.

As the Third Circuit has summarized:

The government may seek a conviction for a substantive criminal offense by introducing evidence that a defendant directly committed the offense or by proceeding on a theory of vicarious liability under *Pinkerton* or aiding and abetting. In *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), "the Supreme Court held that the criminal act of one conspirator in furtherance of the conspiracy is attributable to the other conspirators for the purpose of holding them responsible for the substantive offense." *United States v. Lopez*, 271 F.3d 472, 480 (3d Cir. 2001) (internal quotation marks, citation, and brackets omitted). A defendant is liable for substantive offenses committed by co-conspirators under a *Pinkerton* theory if (1) the defendant is a party to a criminal conspiracy, (2) one or more

co-conspirators committed the substantive offense in furtherance of the conspiracy, and (3) commission of the substantive offense was reasonably foreseeable. *See United States v. Ramos*, 147 F.3d 281, 286 (3d Cir. 1998).

In contrast, to be liable for aiding and abetting under federal law a defendant must "(1) take [ ] an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond* [*v. United States*, 572 U.S. 65, 71, 134 S.Ct. 1240, 1245, 188 L.Ed.2d 248 (2014)]. The Supreme Court in *Rosemond* held that to establish the intent element of aiding and abetting under § 924(c), the government must prove that the aider-and-abettor had advance knowledge that a gun would be employed and decided thereafter to join or continue the underlying offense. *See id*. at 1250.

Both *Pinkerton* and aiding and abetting theories support convictions under § 924(c). *See, e.g., United States v. Casiano*, 113 F.3d 420, 427 (3d Cir. 1997).

*United States v. Whitted*, 734 F.App'x 90, 93 (3d Cir. 2018).  Here, the Court cannot say that the jury would have convicted Wong of § 924(c)(1)(B)(ii) under *Pinkerton* if it had been informed of the *mens rea* requirement as to the machinegun.  Specifically, there is a question, to be answered by the jury, as to whether Wong's co-conspirator's possession of the machinegun during one or both robberies was "merely a part of the ramifications of the plan which could not be reasonably foreseen [by Wong] as a necessary or natural consequence of the unlawful agreement", *Pinkerton*, 328 U.S. at 648.  Even the D.C. Circuit Court's majority opinion in *Burwell*, having found that there was no *mens rea* requirement for § 924(c)(1)(ii), left open the question of whether a defendant could be held liable for a co-conspirator's possession of a machinegun under § 924(c)(1)(ii) if that defendant did not personally possess knowledge of the firearm's characteristics:

> Finally, Burwell and the Federal Public Defender argue *Harris* was fundamentally flawed because it imposes unjust penalties on co-conspirators. They note that without a separate knowledge requirement, "mere" co-conspirators in low-level drug conspiracies might be subjected to 30-year sentences for violent or drug-trafficking crimes committed with machineguns in furtherance of the conspiracy, as long as it is reasonably foreseeable that such crimes would involve guns of any kind. This would be unjust, the FPD argues, if the particular defendant "had no reason to foresee, let alone know, that some member of the conspiracy – any member – would use or possess a machinegun (as opposed to a generic firearm)." FPD Br. at 14. But the premise of this argument is not necessarily correct. The Supreme Court has not extended vicarious liability to situations in which "the substantive offense ... could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *Pinkerton v. United States,* 328 U.S. 640, 647-48, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Because the machinegun provision is an element of the substantive § 924(c) offense, it is not clear (and we express no opinion as to) whether liability would attach to co-conspirators who could not reasonably foresee the use of the machinegun.

*Burwell*, 690 F.3d at 514. Here, this Court cannot say that the jury verdict as to Jury Interrogatories 4.2 and 5.2 would have been the same under *Pinkerton* absent the error.  Where it is not apparent what theory of

57

As previously set forth, the verdict form addressing Counts 4 and 5 asked the jury, separately as to Defendants Wong and Rodriguez, whether the jury found beyond a reasonable doubt that the "Defendant possessed a firearm in furtherance of a crime of violence and/or used or carried a firearm during and in relation to a crime of violence . . . all in violation of 18 U.S.C. § 924(c), 18 U.S.C. § 2, and *Pinkerton v. United States*, 328 U.S. 640 (1946)". (Doc. 149, at 5, 8). In response, the jury found Defendant Wong guilty of both Counts 4 and 5. (*Id.*). The verdict form subsequently included two Jury Interrogatories following both Counts 4 and 5. Jury Interrogatories 4.1 and 5.1 asked the jury whether, as to each defendant, "a firearm was brandished in furtherance of a crime of violence and/or a firearm was brandished during and in relation to a crime of violence, as charged in [Counts 3 and 5] of the Indictment, in violation of 18 U.S.C. § 924(c), 18 U.S.C. § 2, and *Pinkerton v. United States*, 328 U.S. 640 (1946)" (Doc. 149, Jury Interrogatories 4.1 & 5.1). The jury responded "Yes" as to Defendant Wong. (*Id.*). Jury Interrogatories 4.2 and 5.2 asked the jury whether "a machinegun was used, carried, or brandished during and in relation to a crime of violence, or a machinegun was possessed in furtherance of a crime of violence, as charged in [Counts 3 and 5] of the Indictment, in violation of 18 U.S.C. § 924(c), 18 U.S.C. § 2, and *Pinkerton v. United States*, 328 U.S. 640 (1946)" (*id.*, Jury Interrogatories 4.2 & 5.2). The jury again responded "Yes" as to Defendant Wong. (*Id.*).

---

liability formed the basis for the jury's findings in Jury Interrogatories 4.2 and 5.2, the error was therefore not harmless.

The jury instructions and verdict form make clear that the jury was properly instructed as to the necessary elements to find Wong guilty of § 924(c)(1)(A), as charged in Counts 4 and 5 of the Indictment. The jury was also properly instructed, and questioned, as to the additional element necessary to find that a firearm was "brandished" during two separate crimes of violence, in accordance with § 924(c)(1)(A)(ii). Defendant Wong does not challenge these convictions or jury findings, nor does he argue that the Court's instructions to the jury or the verdict form completed by the jury were in error such that the entirety of his convictions for Counts 4 and 5 must be vacated. Rather, where the Government charged Wong in Counts 4 and 5 pursuant to § 924(c)(1)(A) *and* § 924(c)(1)(B), Wong's convictions under subsection (A) remain extant. Thus, because the Court has found that Jury Interrogatories 4.2 and 5.2, and the accompanying jury instructions, omitted the necessary knowledge requirement with respect to the machinegun, only Wong's convictions as to § 924(c)(1)(B)(ii), charged in Counts 4 and 5 must be vacated.[12]

---

[12] This Court's determination that only the conviction for § 924(c)(1)(B)(ii) must be vacated, and not the entirety of Wong's convictions on Counts 4 and 5, is supported by the Third Circuit's Commentary to Instruction 6.18.924B ("Using or Carrying a Firearm During Any Crime of Violence or Drug Trafficking Crime (18 U.S.C. § 924(c)(1)") wherein it instructs that the district court should "provide instructions and special interrogatories regarding those provisions [addressing the involvement of specific firearms such as a machinegun] when they are included in the charges." The Third Circuit thus makes clear that, while a determination of whether a machinegun was involved in the offense is an element of a § 924(c) offense if charged in the indictment, it is not a necessary element to a finding that a defendant is guilty of § 924(c), but rather is an additional element necessary to find a defendant guilty of the more severe penalty included in § 924(c)(1)(B)(ii). The convictions under § 924(c)(1)(A) stand separate and apart from the convictions under § 924(c)(1)(B)(ii) which must be vacated for a new trial.

The present case is also distinguishable from the First Circuit's decision in *Pérez-Greaux*, where the Circuit Court vacated the entire § 924(c) count and remanded for a new trial on that count. There,

Having determined that Defendant Wong is entitled to a new trial on the § 924(c)(1)(B)(ii) charges in Counts 4 and 5, the Court must further address Defendant's additional argument that he is entitled to judgment of acquittal on these charges. Wong's motion for judgment of acquittal only contests the sufficiency and weight of the evidence "in regard to the machinegun interrogatories on the two [§] 924(c) counts." (Doc. 240, at 2); (*id.* (stating that Defendant does not contest "the sufficiency or weight of the evidence regarding most of the offenses of the conviction")). Specifically, Defendant argues that "there was insufficient evidence to support the jury's finding that Defendant knew the firearm at issue in the [§] 924(c) counts was a machinegun in Interrogatories 4.2 and 5.2". (Doc. 240, at 30).

Whereas the harmless error standard requires the Court to determine whether a "rational jury viewing the evidence *could only* have concluded that" Wong knew the firearm at issue had the characteristics of a machinegun, *see Zayas*, 32 F.4th at 225 (emphasis in original), when determining a motion for judgment of acquittal, the Court must determine

---

Count 2 of the Superseding Indictment charged Defendant Pérez-Greaux with the knowing possession of a machinegun in furtherance of a drug trafficking crime (*see United States v. Pérez-Greaux*, 3:18-cr-00389-FAB, D.P.R., Doc. 71). The Government did not allege that any other firearm was possessed or used in furtherance of the drug trafficking crime. Here, Counts 4 and 5 of the Indictment charge Wong with the use of multiple firearms, "including a machinegun." (Doc. 1). Thus, unlike in *Pérez-Greaux*, where the defendant could not have been convicted of Count 2 if the jury found that he did not know that the firearm was a machinegun, in the present case, there was ample evidence of several firearms being used during the robberies at issue and, wholly apart from the machinegun interrogatories, the jury found Wong guilty of "possess[ing] a firearm in furtherance of a crime of violence and/or us[ing] or carr[ying] a firearm during and in relation to a crime of violence", (Doc. 149, at 5, 8). Thus, the entireties of Counts 4 and 5 do not need to be vacated.

whether a "reasonable juror could accept the evidence as sufficient to support the defendant's guilt beyond a reasonable doubt", *see Fattah*, 914 F.3d at 183.

Here, the Government produced sufficient evidence, which, when reviewing the record in the light most favorable to the Government, could have permitted a rational trier of fact to find that Wong knew that one of the firearms used during the August 30, 2020, and September 14, 2020, robberies had the characteristics of a machinegun.

At trial, Batista and LaSalle's testimony demonstrated that the ARP was purchased prior to the first attempted robbery on August 29, 2020. Batista testified that Wong ordered him to participate in the robberies of August 29 and August 30, 2020, and LaSalle testified that Wong ordered him to participate in the robbery of August 30, 2020. Both Batista and LaSalle testified that Wong was the person distributing the firearms, which included the machinegun, used in the robberies in which they were involved.

Furthermore, Batista's testimony, when viewed in the light most favorable to the Government, could support a finding that Wong knew that the firearm purchased by Joushton Rodriguez was a machinegun. On cross-examination, Batista testified that Wong "ordered" Joushton Rodriguez to "purchase the rifle" and "ordered Joushton Rodriguez to bring a rifle" to use in committing the crimes. (Trial Tr., Test. of Batista, June 12, 2024, at 208, 209). In describing the August 29, 2020, attempted robbery, Batista stated that Wong "told Joushton Rodriguez to go in with the rifle." (*Id.* at 179). Batista later reiterated that the ARP "was at Eric [LaSalle]'s house, and then it went to Steven Wong's house because

61

that's what was told – that's what he told Joushton Rodriguez to do." (*Id.* at 216).  When asked whether Batista was "saying that Steven Wong directed Joushton Rodriguez to purchase that firearm", Batista responded that he knew "Joushton Rodriguez and Steven Wong talked at the time" and that "they knew each other at that time" and, while they did not "hang out" every day, they "used to text . . . [and] call." (*Id.* at 210).

Finally, both Batista and LaSalle testified that Joushton Rodriguez had told them, at separate times, that the firearm at issue had the "burst" capabilities that rendered it a machinegun.  There was also evidence, in the form of witness testimony, pictures, and cell phone records, that Joushton Rodriguez and Wong spoke frequently and, as members of the Infamous Ryders Motorcycle Club, spent a significant amount of time together.  Furthermore, Wong was convicted of conspiracy to interfere with commerce by robbery.  At trial, the evidence demonstrated that Joushton Rodriguez had participated in all three robberies at issue: August 29, 2020, August 30, 2020, and September 14, 2020.  A reasonable jury could conclude that Joushton Rodriguez, who the jury learned was closely involved in the multiple robberies, informed Wong at some time prior to the robberies that the firearm he had purchased, and that was used during the robberies, was a machinegun, or that Wong had otherwise been apprised of this information by someone else, including, but not limited to, another co-conspirator, who Joushton Rodriguez had previously told.

For these reasons, reviewing the record in the light most favorable to the prosecution, the evidence of record at trial was sufficient for a rational trier of fact to have found that Wong had the requisite knowledge that the firearm at issue was a machinegun.

Notwithstanding, Defendant's argument with respect to his judgment of acquittal rests on a faulty premise; in the absence of a jury instruction or jury interrogatory addressing the necessary *mens rea* requirement as to Wong's knowledge of the machinegun, there was no "finding [by the jury] that Defendant <u>knew</u> the firearm at issue in the [§] 924(c) counts was a machinegun in Interrogatories 4.2 and 5.2", (Doc. 240, at 30) (underline added). Although for the reasons stated, *supra*, the jury could have reasonably inferred Wong's knowledge that one of the guns used in one or more of the robberies was a machinegun, where the jury was never apprised of this element, the Court's evaluation of the trial evidence would usurp the role of the jury. Therefore, where the Government produced sufficient evidence to allow a jury to reasonably infer that Wong had knowledge of the characteristics of the machinegun used in the robberies, Defendant is only entitled to a new trial as to the 924(c)(1)(B)(ii) charges in Counts 4 and 5. *See United States v. Haywood*, 363 F.3d 200, 206-207 (3d Cir. 2004).[13] *See also, Pérez-Greaux*, 83 F.4th at 27

---

[13] In *Haywood,* Defendant appealed his convictions on a number of counts following a jury trial, including his conviction for possession of a firearm with an obliterated serial number (Count 5). *United States v. Haywood*, 363 F.3d 200 (3d Cir. 2004). The Third Circuit first found that the District Court's jury instruction as to Count Five was erroneous where it failed to correctly instruct the jury that "knowledge that the serial number is obliterated at the time of possession is an element of the offense of a § 922(k) violation" and further that the failure to instruct as to this element was prejudicial to Defendant. *Id.* at 206-207. In determining the proper remedy, the Third Circuit explained:

(finding that although Defendant was entitled to new trial because District Court failed to instruct jury as to the required machinegun *mens rea* element, Defendant was not entitled to judgment of acquittal on this Count because "we cannot say that, given the cumulation of all of [the] circumstantial evidence, no levelheaded jury could have found" Defendant guilty of the charge.).

For the afore-stated reasons, the Court will grant Wong's motion for a new trial on Counts 4 and 5, as limited herein, and deny Wong's motion for judgment of acquittal.

## B. Motion for New Trial – Additional Bases

In addition to requesting a new trial on the bases that the "jury's finding that Defendant [Wong] knew the firearm at issue in the 924(c) counts was a machinegun was against the weight of the evidence" and that the "Court erred in instructing the jury regarding the mens rea requirement pertaining to the machinegun alleged in the 924(c) counts and in

---

The government argues that because Haywood possessed the pistol, hid it on his person and used it in a robbery, the jury could reasonably infer that Haywood would have examined the pistol at some point before the robbery to see if it worked. In addition, the government notes that at some point after the robbery, Haywood disassembled the pistol. Therefore, given these considerations, the jury could have reasonably inferred that Haywood discovered that the pistol's serial number had been obliterated. That is true. The jury could have found beyond a reasonable doubt that Haywood knew the gun had an obliterated serial number had it been instructed of the need to do so under § 922(k). However, no such instruction was given and the government's argument about the jurors' thought process therefore rests upon pure speculation. Haywood has a due process right to "proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [he] is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Speculation about what the jury could have done if properly instructed falls woefully short of that burden.

*Id.* at 207. As a result, unlike a separate count which the Circuit Court vacated with instructions to enter a judgment of acquittal, as to Count 5, the Court reversed the conviction and remanded for a new trial. *Id.*

drafting special interrogatories 4.2 and 5.2", which have been addressed, *supra,* Wong also moves for a new trial on the bases that "the Court erred in not granting a mistrial after the Government utilized evidence in closing that was not presented during trial" and "the Court erred in permitting the Government to introduce expert testimony regarding cellular telephone location data" (*see generally,* Doc. 240, at 36-42).

## 1. Government's Use of Photographs During Rebuttal

At the conclusion of the charge conference on June 20, 2024, the following discussion occurred:

> THE COURT: Just so that there is no confusion here, there were a number of exhibits that were conditionally admitted, subject to the introduction of independent evidence of the conspiracies that are alleged by the Government. That's no longer an issue, if I'm understanding what's happened in trial, but if someone disagrees, I need to know now. I think those documents are admitted. They are admitted now, not conditionally but fully.
>
> [AUSA] BUCHANAN: Yes, Your Honor.
>
> [COUNSEL FOR WONG] MR. COMERFORD: That's correct, Judge.
>
> [COUNSEL FOR S. RODRIGUEZ] MR. O'BRIEN: I agree, Your Honor.

(Trial Tr., June 20, 2024, at 6).

Thereafter, during the Government's rebuttal argument, counsel made the following statement:

> So how much money could he [Wong] have legitimately made in 2020? King's Palace was only opened for approximately four months, he admitted to. The grand opening was sometime in March, St. Patrick's Day, closed four months later, to open Club Dubai, which was only open for two months because the

Defendant testified he was already moving back in September to North Carolina.

So he's got all this cash, and we know how much cash he has. Government's Exhibit 6.30. We know how much cash he has because he likes flaunting it. Government's Exhibit 6.31, Government's Exhibit 6.32, Government's Exhibit 6.47, Government's Exhibit 6.48, Government's Exhibit 6.60, Government's Exhibit 6.62, Government's Exhibit 6.78, Government's Exhibit 4.82. That's that cash box that he whips out in the gun store filled with cash on July 1st of 2020, and if you recall, Eric LaSalle saying, he always just had so much money, he always had so much money.

(Trial Tr., June 20, 2024, at 130-131). The exhibits referenced by the Government during this portion of the rebuttal were each published to the jury.

At the conclusion of closing arguments, outside the presence of the jury, counsel for Wong made a motion to strike and requested a curative instruction:

[W]e have a motion to strike and incorporate a cautionary instruction to the jury regarding a portion of Attorney Roberts' rebuttal, specifically the portion in which she published and utilized the Government's exhibits dealing with cash and my client's possession of cash.

The reason being -- and I know we discussed the conditional evidence this morning, Judge -- I think our understanding of that was that the Government's conditional admission that the exhibits that were being admitted were those that were later brought out in trial, identified, connected, discussed on the record, and made relevant to the conspiracy.

Those pictures of the cash, all of them that were used on rebuttal, not a single one was ever presented to the jury in trial, not a single one was ever testified to by a witness in trial, and furthermore, the connotations of closing was those were proceeds or ill-gotten gains from the conspiracy, when, in fact, the photos themselves predated – I believe they were from July of that year -- and they predate the robberies and the scope of the conspiracy that's been presented in trial. So they wouldn't be relevant.

> Our position is, I think that they were not admitted, they were highly prejudicial, and we ask that they be stricken and that the jury be admonished that they should not consider them in any way.

(Trial Tr., June 20, 2024, at 134-135).

Defendant Wong's motion for a new trial argues that the "Court claimed that Defense Counsel had previously agreed to their admission." (Doc. 240, at 39). The Court's "claim" is entirely consistent with the record. The Court noted that "a number of exhibits" had been conditionally admitted and asked if there was any disagreement as to whether the documents previously conditionally admitted were now fully admitted, to which all parties responded that there was not. Wong's motion does not, and cannot, assert that the exhibits shown to the jury during the Government's rebuttal were not within the batches of exhibits previously conditionally admitted. Instead, Wong's counsel's supposed "justifiable belief" "that the only evidence being admitted was that which had been connected, had been shown to the jury, and had been testified to" (id.) is unsupported. Defendant's counsel's subjective and unarticulated belief provides no basis for his argument. When asked by this Court at the charge conference whether the documents that were previously conditionally admitted were now fully admitted, Defendant's counsel responded, without further comment, "that's correct." If Defendant believed that there were certain exhibits, previously conditionally admitted which should not be fully admitted, Defendant had a duty to raise this issue or to seek clarification as to what exhibits were now being admitted. Defendant did not do so, but rather, on the record, unequivocally agreed that those exhibits previously

67

conditionally admitted were now admitted in full, without any further discussion or qualification.

Further, the record belies Defendant's assertion at trial following the Government's rebuttal that "the connotations of closing was those were proceeds or ill-gotten gains from the conspiracy, when, in fact, the photos themselves predated . . . the robberies and the scope of the conspiracy" (Trial Tr., June 20, 2024, at 134). Rather, the Government, when showing the pictures at issue in rebuttal, stated generally that the photos were from 2020, and as to one photograph, that it was from July 1, 2020, which the jury knew was outside the scope of the conspiracy to interfere with commerce by robbery (Count 1).

Finally, the photographs at issue were relevant to the conspiracy set forth in Count 1 of the Indictment.

> Under Federal Rule of Evidence 401, "[e]vidence is relevant if ... it has any tendency to make a fact more or less probable than it would be without the evidence." The standard is "not high." *Carter v. Hewitt*, 617 F.2d 961, 966 (3d Cir. 1980). Evidence is not irrelevant merely because it arises post-conspiracy, particularly when the evidence sheds light on a defendant's intent. *See Lutwak v. United States*, 344 U.S. 604, 617, 73 S.Ct. 481, 97 L.Ed. 593 (1953). Where the evidence may "giv[e] rise to reasonable inferences of fact" which are central to the determination of the case, there is "no bright line rule for determining when evidence is too remote to be relevant." *Ansell v. Green Acres Contracting Co.*, 347 F.3d 515, 525 (3d Cir. 2003).

*United States v. Wheeler*, 2021 WL 4129731, at *14 (3d Cir. 2021). *See also, United States v. Mangual-Santiago*, 562 F.3d 411, 428 (1st Cir. 2009) ("In establishing the existence of a conspiracy, the government is not bound by approximate start or end-dates listed in the indictment; the scope of the conspiracy may extend beyond an approximate date. *See*

*United States v. Paredes-Rodriguez*, 160 F.3d 49, 56 (1st Cir.1998) ('[T]he reference to approximate dates in an indictment is not binding and thus the scope of the indictment may cover prior events.').")). Thus, simply because the photos shown on rebuttal may have been outside the time-frames set forth in the Indictment does not necessarily render the photos irrelevant. Instead, as suggested by the Government, the photographs tend to show that, in 2020 and immediately prior to the commencement of the conspiracies, Wong was frequently in possession of large amounts of cash and the cash was not obtained by lawful means. This was corroborated by trial testimony that Wong was engaged in illegal drug distribution in 2020. (*See e.g.*, Trial Tr., Test. of LaSalle, June 13, 2024, at 187, 189 (testifying that immediately prior to, and during the time-frame set forth in the conspiracy, Wong provided him with "Molly" for his personal consumption and that Wong "wanted us to sell the Molly"); Trial Tr., Test. of LaSalle, June 14, 2024, at 17, 64; Trial Tr., Test. of Batista, June 12, 2024, at 194 (testifying that Wong gave him "Molly"); Trial Tr., Test. of Marsh, June 13, 2024 (testifying that Wong sold him marijuana).[14] The photographs at issue served to demonstrate intent to specifically rob other drug dealers and suggest motive as to one or more of Wong's reasons for ordering the robberies and participating in the conspiracy to interfere with commerce by robbery.

---

[14] The photographs at issue shown by the Government during rebuttal were all created in 2020 and are not remote in time from the dates of the charged conspiracy. (*See* Gov. Ex. 6.12). Although LaSalle, Batista, and Marsh's testimony regarding Wong providing and/or selling drugs largely related to events immediately prior to, or during the charged conspiracy in Count 1, it is reasonable for the jury to infer that Wong began using/selling/providing illegal substances prior to this time.

For the afore-stated reasons, in exercising its own judgment in assessing the Government's case, the Court finds that the interests of justice do not require a new trial on the basis that "the Court erred in not granting a mistrial after the Government utilized evidence in closing that was not presented during trial" (Doc. 240, at 38).[15]

### 2. Expert Testimony Regarding Cellular Telephone Location Data

On the sixth day of trial, the Government called ATF Special Agent Michael Plesniak as a witness in this case. Following questioning by the Government as to his qualifications, including his relevant experience, training, knowledge, and education, and extensive cross-examination by defendants' counsel, the Court admitted Agent Plesniak as an expert in Cell Site Analysis and Mapping. (*See* Trial Tr., June 18, 2024, at 1-22).

Defendant Wong now argues that the "Court erred in permitting the Government to introduce expert testimony regarding telephone location data." (Doc. 240, at 40). Specifically, Defendant asserts that:

> Plesniak's entire testimony focused on the use of TraX generated maps. Yet, he did not know if the software or method is peer-reviewed. He does not know any of the mathematical, scientific or statistical principles that the TraX program uses to create its map. He, simply, admitted that he did not know how the program worked. He, simply, plugged numbers into it. This was not helpful to the jury, and absent an ability to explain how the program works, he should not have been permitted to testify. This was a massive part of the Government's case. As they argued in their closing, this was the only real corroboration of their discredited co-conspirators' testimony.

---

[15] The Court also notes that Defendant's counsel never moved for a mistrial following the Government's rebuttal. Instead, Defendant moved "to strike and [to] incorporate a cautionary instruction" as a result of the Government's use of the photographs at issue, (Trial Tr., June 20, 2024, 134-135).

(Doc. 240, at 41).[16]

The Federal Rules of Evidence, and Rule 702 in particular, assign the trial court "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). Pursuant to Rule 702, governing the admissibility of testimony by expert witnesses:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

---

[16] Wong does not dispute the Government's assertion that he "had been provided the Cell Site Analysis created by Special Agent Plesniak for over a year before trial, original expert notice months before trial, and a final supplemental expert notice on weeks prior to trial" (Doc. 256, at 83 n. 10). Despite being provided with significant notice as to the contents of Agent Plesniak's expected testimony, and the basis therefor, at no time prior to trial did Defendant seek a *Daubert* hearing. As the Supreme Court has made clear, when parties dispute the basis of an expert's conclusions that are otherwise admissible under Rule 702 and other applicable Rules of Evidence, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Despite having all of the relevant information well-before trial, Defendant made the tactical decision to wait until the Government called Agent Plesniak to the stand to object to his admission as an expert. In addition, despite the ability to do so, Defendant did not attempt, prior to trial, to compile evidence to contradict or place at issue any of Agent Plesniak's expected testimony.

The inquiry under Rule 702 is "a flexible one." *Daubert*, 509 U.S. at 594. The overarching subject of the Rule is "the scientific validity and thus the evidentiary relevance and reliability – of the principles that underlie a proposed submission." *Id.* at 594-595. The Court of Appeals for the Third Circuit has explained that:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. [*In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741-743 (3d Cir. 1994) ("*Paoli II*")] (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, (1993)). Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." *Id.* Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his on her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." *Paoli II*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786). Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." 509 U.S. at 591-92.

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-405 (3d Cir. 2003).

Prior to being admitted as an expert at trial, Agent Plesniak testified as to his formal education and work history. He explained the field of "Cell Site Analysis and Mapping" as follows:

> . . . [S]o most people carry a cell phone around, and the three major cell providers, T-Mobile, AT&T and Verizon, operate a cellular network, and each of those cellular networks are comprised of cell sites, and they're the physical locations of antenna that your cell phone connects to, when you're using it.

So those companies, as part of their business records, they maintain a database, where they save the records to see when people are using phones, whether it's voice, text messages or applications, they maintain a database just to check on it to make sure their network is working properly, make sure there are not dropped calls, things like that.

So Cell Site Analysis, we can get those records in law enforcement, and we can look and see where a phone is, based on, generally, based on which cell sites it's connecting to.

(Trial Tr., Test. of Plesniak, June 18, 2024, at 6).

Agent Plesniak further explained his training in cell site analysis to the jury on direct examination:

Q. You had testified that you became an expert in Cell Site Analysis. Can you explain to the jury what your specific training is and educational background is for that area?

A. Yes, so when I was at the Philadelphia Field Division, there was a need for a Cell Site Expert to do Cell Site Location Analysis, and I went to do Cell Site Analysis.

. . . .

So there was a need in the Philadelphia Field Division for someone to learn Cell Site Analysis, so I consulted with some other experts in the field, and I found a training program through a company that was formerly called ZetX, it's now part of LexisNexis called Accurint or TraX, and they had a basic course, a basic 40-hour course that I took in 2018.

Then, I took a Subject Matter Expert 40-hour course, and then I followed up, again, I think, 2021-2022 -- sorry -- 2022, I followed up and took the Subject Matter Expert course, again, to kind of refresh and catch up with newer technologies.

(*Id.* at 5-6).  He testified that he had "done hundreds of mappings [and] looked at, maybe, up to thousands of records, hundreds of records, maybe, up near the thousands of records, probably, worked on between 50 and 100 cases." (*Id.* at 7).  He has assisted the ATF,

73

Philadelphia Police Department and "a few smaller local municipalities in New Jersey" with Cell Site Mappings and Analysis. (*Id.*).

With respect to TraX specifically, Agent Plesniak testified that he has been trained in this program and that it is generally accepted in his field. (*Id.*).

Agent Plesniak admitted that he did not know whether the algorithm used by TraX had been peer-reviewed by anyone in the scientific community and that he was unaware what mathematical, scientific or statistical principles the TraX program uses to come up with the formula or algorithm that produces the mapping. (*See id.* at 9, 10, 11). Nonetheless, he explained:

> When I did the initial training with ZetX and we were in the initial training, they pull up -- you can go to their website still, actually, and there's a list of scientific standards that really goes into detail about antennas and propagation and horizontal planes. That's really beyond the scope of what I need to do for my analysis, so all that stuff is on their website, scientifically, and I can pull up the articles for you, if you wanted, but I don't go that deep to get into the scientific portions of antennas or radio waves or anything like that.

(Trial Tr., Test. of Plesniak, June 18, 2024, at 10).[17] Although Agent Plesniak admitted that he could not explain how the algorithms worked "on the back end", he stated that:

> . . . the accuracy of the program was tested by the company, and what they do is what's called a drive test, where they, actually, drive around on the streets with a device that tells the program which tower the device is connecting to, as if it was a cell phone.

---

[17] Agent Plesniak also stated that Sy Ray was the owner of ZetX, which developed TraX, and that Ray "taught portions of the first class" that Agent Plesniak took on this subject. (Trial Tr., June 18, 2024, at 8-9).

So they drove around the streets, they've done, I think -- the last I saw, from training, was over, like, one and a half million records -- and they've driven around the streets to make sure that their ranges, their mapping is accurate, and they're over 90 percent accuracy, is what they report.

(*Id*. at 13-14).

Agent Plesniak further explained:

I know that when I receive the records, I do spot checks. So when I receive the cellular records, it's a raw data, sometimes, in a text file, sometimes, in a spread sheet, depends on the company, and to make sure -- it would be impossible for me to go through thousands of lines of records -- but to make sure that the computer system isn't making things up, I spot-check it, I go in and manually map from the GPS coordinates in Google Earth and make sure that the cell site where they're mapping it is, also, where they're at in the records.

(*Id*. at 9-10). He later re-iterated his method of checking the accuracy of the data:

. . . I go in and spot-check the records, I make sure, and I will take -- you know, usually, about a dozen per case, so for each of these events, I probably took about a dozen per phone, randomly throughout, throw it into Google Earth to make sure the cell site location is what matches with the records and compare it to what the TraX program mapped, and I found no inaccuracies when I did that. I can't remember exactly how many records I did for this case, but I found no inaccuracies, at all, when I did that for this entire case.

(*Id*. at 10-11; *see also, id*. at 16 (stating that he uses this spot-check approach to verify the analysis of the locations "every time" he analyzes records.)). When asked, specifically, what he does when he receives call detail records, in order to perform a Cell Site Analysis and Mapping, Agent Plesniak testified:

So, first, I review the records, manually, I open them up, just look at them, make sure the records look like what I would expect to see from T-Mobile, Verizon or AT&T. The TraX program is a web-based service, so I go to their website, it's kind of like a drag and drop, I drag the files in that are relevant, and the TraX program creates a Google Earth file.

75

Once I have that file, I'm able to open their product in Google Earth, I go back to the original records, like I said, I spot-check, so I'll go down about a dozen, just pick random lines, I will take the geo coordinates of the cell site location records, the CDR's that we get from the companies have GPS coordinates in them.

So I will take those GPS coordinates, plug them into Google, I will zoom down in Google, and, say, Okay, there's a cell site here, you can see it right here in Google Earth, now, let me open up the ZetX or whatever, TraX, whichever way you want to refer to it, I'll open that file, go to that time where it says it's using that cell site, and I'll compare that to what I manually mapped.

(*Id.* at 15-16). He clarified the purpose and application of TraX as follows:

. . . So when I talk about the spot check, again, that's me going in -- so you have to understand that the TraX program, the ZetX program, it's just a visualization of the records, it's just a way to visualize that we can see on a map so it's easier to explain to you. The records, kind of, stand for themselves.

A lot of what I testified to is directly based on the records that are provided by the cellular service providers, and, then, the TraX program just creates a visualization for that. So I just want to make sure, when I'm doing my work, that the visualizations are accurate, so when I do a spot check -- again, I can't go through a thousand lines of cell phone data for each phone -- but I can pick random ones throughout, as I go down, and just make sure, Yes, this is lining up, this is lining up, okay, and if I find an inaccuracy, I have to deal with that. I did not find any inaccuracies in this case.

(*Id.* at 19-20; *see also, id.* at 22 ("Again, the [cell site] programs just create a visualization, that's all they do. The records are the records.")).

Having been admitted as an expert in Cell Site Analysis and Mapping, at trial, Agent Plesniak testified as to the estimated cell phone locations of Joushton Rodriguez, Solomon Rodriguez, Alarick Batista, Eric LaSalle, and Cornelius Green, where relevant, at certain times of the days/nights of August 29, August 30, and September 14, 2020. In doing so, he

presented a PowerPoint exhibit visually demonstrating shaded areas of the approximate location of these individuals' phones within a certain cellphone coverage area. Agent Plesniak also presented, and testified as to, the raw data that he received from the cell phone carriers and how he used this data in determining the approximate locations of these individuals' phones both through the TraX program and through independent spot-checking using this data.

> Agent Plesniak began by explaining to the jury the definition of a "cell site":

> So cell sites are part of a cellular network, like I said earlier, a cell cite [*sic*] is an individual physical location where the antenna is, so when you're walking around, carrying your cell phone, your cell phone is constantly communicating with the network trying to find the best signal to connect to, then, when you go to use your phone, text message data and app, surf the web, make a phone call, your phone now connects to that radio signal, that antenna signal, from the cell site, and that's how you get service on your phone.

(Trial Tr., Test. of Plesniak, June 18, 2024, at 24). After providing several examples of cell sites and the various antennae that can be used in determining cell phone location, he explained that the range of a cell site "can range from a couple hundred meters to 20 or 30 miles", depending on a number of factors, including the surrounding terrain, such as hills, mountains, and buildings and the type of cell sites in the area. (*Id.* at 26; *see also, id.* at 59).

In addressing how TraX works, Agent Plesniak testified that "the TraX program uses what's called cellular frequency" or "cell site frequency" "which is the amount of cell sites in an area." (*Id.* at 28-29). He acknowledged that the program provides "just an estimate, . . .

it uses cell site frequency, the amount of cell sites in the area, and takes a percentage of that, because this is how far we expect that cell site to cover, because if it covered any more, it would be using the other cell site." (*Id*. at 29). He further acknowledged that a cell phone may not connect to the geographically closest cell site, but rather, may connect to "the best signal." (*Id*.). Nonetheless, the cell phone would have to be in the actual range of a cell site in order to connect with it. (*Id*. at 30). Agent Plesniak thus admitted that he is unable to "pinpoint the exact location of a phone." (*Id*.). Throughout Agent Plesniak's testimony, he repeatedly made clear that the areas in which he was testifying that the cell phones of one or more individuals were present were approximations and that he could not state with precision the exact location of the cell phones. (*See e.g., id.* at 36 (showing a shaded area illustrated on his PowerPoint slide explaining that this is "an estimate" and that he was "by no means . . . testifying that the phone is definitely within that blue shape, it's somewhere near that blue shape."); *id*. at 52-53 (when asked whether the PowerPoint demonstrated that two individuals' cell phones were traveling together, responding that "it's consistent with what I would expect to see for phones traveling together [but i]t's not accurate enough for me to say both phones were in the same car...")).

Here, Defendant Wong's motion does not challenge the reliability of the TraX program itself. Rather, Wong's argument is limited to Agent Plesniak's knowledge, or lack thereof, as to how the program works. The premise of Defendant's overarching argument imposes a heightened, and virtually impossible, burden on the Government than that

required by *Daubert*, implicitly suggesting that any witness who uses specific tools to reach their opinions must also be an expert in the underlying development of the device, program, or software.  Rather, *Daubert* dictates a "flexible" test that requires "the trial judge [to] determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592.  Instead, Defendant's current argument imposes a corresponding obligation on the part of a witness, to be qualified as an expert, to explain how all of the underlying technology, equipment, and programming was developed and works on all levels, not simply how the witness is qualified in applying this technique, if accepted as scientifically reliable, and applying its results. *See e.g. United States v. Morgan*, 45 F.4th 192, 203 (D.C. Cir. 2022).[18]

---

[18] In *Morgan*, the D.C. Circuit rejected Defendant's argument that the District Court had improperly admitted expert testimony by an FBI Agent to opine as to the locations of the defendant and another individual on the day at issue.  Defendant raised a number of issues in support of this argument, including "challeng[ing] the reliability of [Agent] Horan's testimony on the ground that Horan could not explain the computer algorithms that processed the drive-test data and generated the coverage maps." *Morgan*, 45 F.4th at 203.  The Circuit Court reasoned:

> [W]e have never held that Rule 702 requires an expert to have a sophisticated understanding of the software underlying her technological tools. *Cf. United States v. Chiaradio*, 684 F.3d 265, 278 (1st Cir. 2012). If we required expert witnesses to have detailed knowledge of the software underlying their testimony, they could almost never testify on matters related to proprietary technology. For example, "anyone who testifies using any basic software such as Excel ... to provide financial analysis[ ] would be required to be an expert in the algorithms by which Excel codes its formula and calculations." [*United States v. Nelson*, 533 F.Supp. 3d 779, 798 (N.D. CA.)] (citation and quotation marks omitted).

> Federal Rule of Evidence 702 does not compel that result. The touchstone of Rule 702 is reliability. Even if Horan could not explain the inner workings of the software that generated the drive-test maps, he could assure the reliability of his drive test and the maps it generated through other means. Horan was indisputably qualified to testify about a technological tool

Contrary to Defendant's contention that Agent Plesniak "admitted that he did not know how the program worked" (Doc. 240, at 41), Agent Plesniak demonstrated sufficient knowledge of the TraX program, including how the manufacturer of TraX had tested the program, the manner in which the program generated its "visualization of the records", the necessary data to be inputted, and how to properly use this program. He further testified as to his own measures undertaken to "spot check" the visualizations produced by the TraX program and ensure the accuracy of these visualizations.

Furthermore, Agent Plesniak's testimony at trial was narrowly tailored in so far as it was limited to the general location of the cell phones of Wong's alleged co-conspirators. Agent Plesniak did not purport to know the precise location of these individuals, but only testified as to the area in which these individuals' cell phones were located in relation to the various cell sites. A number of courts have found that this approach reduces concerns regarding the reliability of an expert's testimony as to cell phone data and satisfies *Daubert*'s requirements. *See e.g. United States v. Gatson*, 744 F.App'x 97, 102 (3d Cir. 2018) (affirming District Court's analysis and conclusion regarding the reliability of FBI Special Agent's testimony, in part, because the expert was "only testifying to 'the general location of where Gatson's cell phone would have to be ... to utilize certain cell sites.'")

---

that has earned wide acceptance in a relevant industry, and he used the tool in its customary manner. His inability to explain a proprietary algorithm did not pose a categorical bar to a finding of reliability.

*Id.*

(quoting *United States v. Gatson*, 2015 WL 5920931, at *2 (D.N.J. 2015)).  *See also, United States v. Reynolds*, 86 F.4th 332, 347 (6th Cir. 2023) (acknowledging that "courts have cautioned that an antenna-mapping technique might raise *Daubert* concerns if the expert overpromises on the technique's precision by misleadingly suggesting that the data pinpointed a defendant to a precise location – like GPS data can do" but collecting case law demonstrating that "when considered from a high level of generality, the function that TraX performs has general (perhaps universal) acceptance . . . [and c]ourts and scientists alike have widely accepted the common practice of determining a cellphone's general location – with critical emphasis on general – by identifying the specific antenna that the phone connected to at a specific time.") (internal citations and quotation marks omitted); *United States v. Hill*, 818 F.3d 289, 298 (7th Cir. 2016) ("In his trial testimony, Agent Raschke emphasized that Hill's cell phone's use of a cell site did not mean that Hill was right at that tower or at any particular spot near that tower. This disclaimer saves his testimony. Historical cell-site analysis can show with sufficient reliability that a phone was in a general area, especially in a well-populated one. It shows the cell sites with which the person's cell phone connected, and the science is well understood.").

Defendant Wong additionally argues that Plesniak "did not know if the software or method is peer-reviewed." However, as noted by the Sixth Circuit, citing a District Court within the Middle District of Pennsylvania, in specifically addressing the TraX program:

> [A]s the Supreme Court has noted, it is sometimes not surprising that peers have not reviewed a given technique if the relevant issue has never "interested

81

any scientist." *Kumho Tire* [*Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999)]. And, as another court has noted, TraX might have few (if any) uses outside of "criminal investigations" to make it worthy of a scientist's time. *United States v. White*, 2023 WL 3161953, at *4 (M.D. Pa. Apr. 27, 2023).

*Reynolds*, 86 F.4th at 347.

With respect to "fit", Defendant does not argue that Agent Plesniak's testimony was not relevant, only that it was not helpful to the trier of fact. Having found that Agent Plesniak was properly qualified as an expert and that his testimony was reliable, it is evident that his testimony was both highly relevant to the issues to be decided by the jury and that it was helpful. Agent Plesniak testified as to the locations of the cell phones of several of Wong's alleged co-conspirators on days relevant to the robberies, or attempted robbery, at issue. This testimony further aided the jury in assessing the credibility of not only Batista and LaSalle, but also of Wong and Solomon Rodriguez when they each testified in their own defense.[19]

Finally, Defendant's assertion that Agent Plesniak's testimony was a "*massive* part of the Government's case" and "was the only real corroboration of [the Government's] *discredited* co-conspirators' testimony" (Doc. 240, at 41) (emphasis added) is entirely disingenuous. It is undisputed that Agent Plesniak's testimony did, in large part, corroborate

---

[19] Agent Plesniak did not receive the cell phone records for Wong's cellphone(s) and therefore did not testify as to the location of those cell phone(s). However, his testimony as to the cellphone locations of Wong's alleged co-conspirators may have provided the jury with circumstantial evidence of Wong's associations with these individuals on the days at issue, contradicting Wong's denials of his participation in the robberies.

the testimony of LaSalle and Batista as to the locations of various co-conspirators immediately prior to, during, and after the robberies at issue. However, it was for the jury to weigh the evidence and credibility of each of the witnesses' testimony, including that of LaSalle and Batista. Defendant Wong's stated unilateral disbelief of the co-conspirators' testimony in this case, while not surprising given counsel's desire to discredit them in an attempt to prove Defendant's innocence, does not equate to a finding that those witnesses were, in fact, discredited at trial. Rather, in finding Wong and Solomon Rodriguez guilty at trial, it is reasonable to believe that the jury did believe a portion, if not all, of LaSalle and Batista's testimony, even that unrelated to the various conspirators' locations at the time of the robberies. Furthermore, Defendant's characterization of Agent Plesniak's testimony as "massive" ignores the substantial evidence, wholly aside from the testimony of LaSalle and Batista, as to the identities of the participants in the conspiracies and robberies at issue in this case and the location of these individuals.

For these reasons, the Court will deny Wong's motion for a new trial on the basis that "the Court erred in permitting the Government to introduce expert testimony regarding cellular telephone location data" (Doc. 240, at 40).

## C. Prosecutorial Misconduct

In addition to moving for a new trial and for judgment of acquittal, Defendant Wong further requests that this Court "exercise its supervisory authority and dismiss this case due to egregious Government misconduct" (Doc. 240, at 23) both prior to, and during, the trial.

83

A Court has the inherent power to dismiss an indictment when presented with certain circumstances. "The exercise of [a Court's] inherent authority must satisfy two requirements: (1) it 'must be a reasonable response to the problems and needs confronting the court's fair administration of justice,' and (2) it 'cannot be contrary to any express grant of or limitation on the district court's power contained in a rule or statute.'" *United States v. Wright*, 913 F.3d 364, 371 (3d Cir. 2019) (quoting *Dietz v. Bouldin*, 579 U.S. 1885, 1892 (2016)).

In *Wright*, the Third Circuit thoroughly examined the contours of a District Court's inherent authority to dismiss a criminal action, explaining:

> As to the first *Dietz* requirement, "[g]uided by considerations of justice, and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress." Such rules must be imposed (1) "to implement a remedy for violation of recognized rights," (2) "to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury," and (3) "as a remedy designed to deter illegal conduct." Thus, a court may exercise its inherent authority only when it is necessary to address improper conduct and ensure respect for the proceedings.
>
> Under these principles, a court may dismiss an indictment based upon its inherent authority only if the Government engaged in misconduct, the defendant was prejudiced, and no less severe remedy was available to address the prejudice.

*Wright*, 913 F.3d at 371 (internal citations omitted). With respect to the second *Dietz* requirement:

> The second *Dietz* requirement reminds a court that the exercise of its powers must be in accordance with the Constitution, statutes, and rules. Beginning with the Constitution, a court must be mindful of its role in our tripartite form of

government and the doctrine of separation of powers. Separation-of-powers principles limit a court's inherent authority. "Regardless of whether the supervisory power stems from the federal courts' inherent power to check intrusions by other branches of government or whether it is a form of specialized federal common law, the separation-of-powers principle imposes significant limits on it," and "[p]roper regard for judicial integrity does not justify a 'chancellor's foot veto' over activities of coequal branches of government."

In the criminal context, the Executive Branch has "broad discretion as to whom to prosecute," and this discretion "rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review." . . . Thus, absent constitutional concerns, the decision to try or retry a case is at the discretion of the prosecutor. . . Accordingly, separation-of-powers principles preclude a court from terminating a prosecution absent misconduct and prejudice to the defendant.

*Id.* at 373-374 (internal citations omitted).

Defendant Wong asserts a series of "flagrant and repeated misconduct" (Doc. 240, at 13) by the Government in support of his request for dismissal of this action. The Court will address the allegations in turn.

### 1. "Scheme" to Delay Trial

Wong argues that the Government "schemed" to delay bringing his case to trial, as evidenced by the seven indictments related to Defendant Wong brought between 2020 and 2024 (*see* Doc. 240, at 21-22; 26):

. . . following the initial Indictment on the robbery conspiracy in Wong II, the Government spent the next three years intentionally scheming to delay bringing Wong's case to trial. The Government charged Defendant for what was essentially one conspiracy over the course of four separate dockets and over seven indictments. The Government made knowing misrepresentations regarding the delays in this case. They were sloppy, and the Court specifically challenged their "questionable conduct."

85

(*Id.* at 26).

Here, Defendant's arguments summarily repeat those previously raised by him in his "Motion to Dismiss for Violation of Defendant's Right to Speedy Trial" in *Wong III* (*see* 3:22-cr-72, Docs. 213, 214). There, on May 22, 2024, the Court granted in part and denied in part Wong's motion, (3:22-cr-72, Docs. 270, 271). Specifically, the Court dismissed Counts 1, 4, and 5 of the First Superseding Indictment (which were Counts 1, 3, and 4 of the Second Superseding Indictment) without prejudice based on a violation of the Speedy Trial Act and denied Defendant's motion to dismiss the remaining counts. As a result of this Court's ruling, the Government dismissed the operative indictment in *Wong III* after obtaining a new Indictment against Wong, Solomon Rodriguez, Joushton Rodriguez, and Zeidan in the above-captioned action (3:24-cr-139), which set forth the same counts as those contained in the Second Superseding Indictment in *Wong III*.

The Court's detailed opinion in *Wong III* (3:22-cr-72, Doc. 270) is incorporated herein and fully addresses Wong's current re-assertions of delay and prejudice. As noted therein, the actions of Wong and his co-defendants caused a substantial amount of the delay in *Wong II* and *Wong III*, the Government was only responsible for one isolated significant period of delay throughout the course of the multiple cases and indictments brought against Wong, and "Defendant's assertions of prejudice as a result of any delay in this case [*Wong III*], including the delay as to Counts 1, 4, and 5, are without merit", (*see generally, id.; see also, id.* at 38); (*cf., id.* at 60 (analyzing Wong's Sixth Amendment arguments and

86

concluding that "the fourth *Barker* factor does not weigh in Wong's favor as he has not established that he suffered specific prejudice or that he is entitled to a presumption of prejudice due to the delay in commencing trial in this matter.")). Further, the Government's violation of the Speedy Trial Act as to certain counts of the First and Second Superseding Indictment in *Wong III* was cured by the dismissal of those counts, the Government's dismissal of *Wong III*, and the Government's subsequent re-indictment of Defendant in *Wong IV*.

To the extent that Defendant is now seeking reconsideration of the Court's May 22, 2024, memorandum opinion and order, as interpreted by the Government (*see* Doc. 256, at 66-67), the Government correctly notes that such a motion is both untimely and without merit. Defendant Wong has not asserted any intervening change of law, the availability of new evidence not previously available in 2024, or the need to correct clear errors of law or fact or to prevent manifest injustice. *See Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). In addition, where the Court has already ruled on Defendant's assertions of delay by the Government and resulting prejudice, Defendant inappropriately uses this motion "as a means to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant", *Donegan v. Livingston*, 877 F.Supp.2d 212, 226 (M.D. Pa. 2012) (quoting *Ogden v. Keystone Residence*, 226 F.Supp.2d 588, 606 (M.D. Pa. 2002)).

87

Therefore, the Court rejects Defendant's assertion of prosecutorial misconduct as the result of any delay in bringing Wong to trial.

### 2. Government "Coercion" and "Threats" Towards Joshua Marsh

Defendant Wong claims that "Government agents improperly coerced and threatened witnesses", specifically co-conspirator Joshua Marsh, citing to statements made by Government Agents to Marsh during his August 2021 interview with the Government (Doc. 240, at 19; *see also, id.* at 24-25). Wong's fleeting argument is bereft of any case law and fails to assert any prejudice, instead merely inviting this Court to infer that Wong must necessarily have suffered prejudice, or the Government necessarily engaged in misconduct, due to certain statements made by Agents Markovchick and McKinney during the August 19, 2021, interview with Marsh.

On June 22, 2021, Government Agents, including Special Agent Jamie Markovchick, interviewed Joshua Marsh. (*See* Trial Tr., June 18, 2024, Test. of Markovchick, at 199). Following this interview, Government Agents re-interviewed Marsh on August 19, 2021.

At the beginning of the August 19, 2021 interview, Agent Markovchick explained to Marsh that "the issue we have is the day at the state police barracks when we talked [June 22, 2021 interview] everything that we went through and talked to it was like the whole – . . . you made it sound like all the shit went down in a whiz bang fucking, like, day." (Tr. of Aug. 19, 2021, Marsh Interview, Doc. 240-5, Ex. E, at 2). When Marsh responded that "it didn't go all in one day", Agent Markovchick stated that "[o]kay[, s]o we have to unfuck that." (*Id.*).

Agent Markovchick explained that Marsh may have to testify at a later time and that "all we want is the truth." (*Id.*).

Agent Markovchick repeatedly emphasized early in the interview that Marsh needed to be truthful and only tell the Agents what he knew to be true. (*See e.g.*, Tr. of Aug. 19, 2021, Marsh Interview, Doc. 240-5, Ex. E, at 4 ("[our shit] needs to be in line in a row exactly the way it happened."); *id.* at 6 ("I don't want hearsay. I want shit that you know. . . . If you don't know, then just tell us. . . . Don't fill in the blanks. I don't care if you don't know.")). Marsh then told the Agents about his interactions with Wong, and other individuals, and about the August 30, 2020 robbery. Thereafter, approximately halfway through the interview, Agent Markovchick informed Marsh that he wanted to "reiterate" what Marsh had told him and asked Marsh to correct him and "stop [him] if you think [he] fucked up." (Tr. of Aug. 19, 2021, Marsh Interview, Doc. 240-5, Ex. E, at 46). As Agent Markovchick reiterated Marsh's story, Marsh interrupted him several times to correct, or clarify, certain statements by Agent Markovchick. (*See id.* at 47-57). As the interview came to an end, the following exchange occurred between Marsh and Agent Markovchick:

MARSH: I'm willing to do whatever keeps me out.

MARKOVCHICK: Well, that's what I'm saying. The best fucking thing that you probably ever did in your entire life was sit down with us and immediately admit to fucking doing the home invasion because that went fucking light years with the US Attorney's Office because they – he wants to crush everybody. He's insane. He's like a pro wrestler but in a courtroom. Like, he's just – he just wants to fucking steam roll everybody. So when we – I mean, he listened to your – to your first interview and everything else, and he's, like, holy fuck, he just laid it all out.

Now, like I said, you know, we didn't think you were lying. We just had to get everything straight because in our brains what you said yesterday and what you said the first day we met were not adding up but now they are. So that's great.

So he is not going to, you know, go after you right away.  So everything that you're doing is perfect.  Keep going to work.  If you are selling or doing anything on the side or slinging, I would recommend fucking not doing that because if you get jammed up you're going to be in rough shape.

(Tr. of Aug. 19, 2021, Marsh Interview, Doc. 240-5, Ex. E, at 69-70).

At trial, counsel for Defendants Wong and Rodriguez both questioned Agent Markovchick about his statements made during the August 19, 2021, interview, with a specific focus on Agent Markovchick's statements about the U.S. Attorney and that Marsh's story needed to be "unfuck[ed]". In response, Agent Markovchick explained:

. . . the way he [Marsh] was interviewed the first day, upon the arrest for the PFA, he was speaking at a very high rate of speed, and all the events that he described being involved with sounded like they occurred within two hours, because he was just go, go, go, he wouldn't stop talking.
. . . .

We found out later, when he went inside [the house], he popped an Ecstasy tablet, which is why he was all hopped up at the police department and why he was speaking too quickly.

So the second time I interviewed him, and I said, "We need to unfuck your statement", that was because he was rapid fire, telling me all the things that he was involved with, and the time line was off. I wanted to go back and re-visit that statement and make sure that I had it correct and accurate and the truth per him.

90

As far as my terminology, unfuck, I do use vulgarity, on occasion, when interviewing certain types of criminals. I find that it brings me to their level, gives credibility to me, when they see a guy that's been around the block, using certain words and terminologies, and that's why I did that that day.

(Trial Tr., June 18, 2024, Test. of Markovchick, at 201-202). Agent Markovchick later further explained:

I adjust my interview style to my audience. So I find that, over 15 years of doing violent crime-related interviews, that the people I interview respond more positively to an Alpha male approach to the interview. If I walk up to them and politely say, Excuse me, sir, would you please explain where you were the other night? Would you tell me what went down? They would laugh at me.

They need to respect me, first, and once I gain their respect, that's when they become willing to talk to me. So I adjust my approach, in order for them to be more accepting of me and trust me and, eventually, hopefully, they tell me the truth.

(*Id.* at 207-208).

Here, there is nothing in Agent Markovchick's statements during the August 19, 2021, interview to suggest that he was counseling, suggesting, or intimating that Marsh should lie or that he coerced or threatened Marsh in any way. Agent Markovchick told Marsh to tell the truth and asked Marsh to correct him if he misstated anything Marsh had told him. While Agent Markovchick used strong language in speaking with Marsh, the record does not support an inference that this language affected the veracity of Marsh's statements to the Government Agents. Although Defendant appears to suggest that Agent Markovchick's statements about the U.S. Attorney caused Marsh to change his story or to

lie to the Agents, these statements came at the end of the interview, after Marsh had described his interactions with Wong and his involvement in the August 30, 2021, robbery.

Furthermore, Defendant extensively cross-examined Marsh at trial as to alleged inconsistencies between his statements in the recorded interviews of June 22, 2021, and August 19, 2021, as well as alleged inconsistencies between one or both of those recorded statements and his testimony at trial. It was the province of the jury, having been made aware of any inconsistencies, to evaluate Marsh's credibility and determine what weight to afford Marsh's trial testimony. *See e.g. United States v. Salahuddin*, 765 F.3d 329, 347 (3d Cir. 2014) ("The majority of [Defendant's] arguments amount to challenges to Mazzocchi's credibility and motives. He argues that Mazzocchi gave false and inconsistent testimony and manufactured the conspiracy as reflected in the recordings. We can entirely reject these arguments, as the jury was made aware – through cross-examination, closing arguments, and the jury instructions – of Mazzocchi's motivations, potential bias, and inconsistent testimony. Equipped with this knowledge, it was the jury's responsibility to decide whether or not to believe Mazzocchi's testimony.").

Wong has failed to demonstrate any basis for his assertion that Marsh was "coerced", or to set forth any basis for a finding of prejudice as a result of Agent Markovchick's statements during the interview of August 19, 2021. As a result, Defendant's assertion of prosecutorial misconduct is without merit.

## 3. Grand Jury Testimony

Defendant Wong further asserts that the Government, through ATF Special Agent Michael McKinney, presented "materially false information" to the Grand Jury at three of the four Grand Jury proceedings. (Doc. 240, at 20-21). Specifically, Defendant states that at the proceedings of September 15, 2021, January 19, 2022, and February 22, 2023, Agent McKinney testified that "Marsh told him specifically [that he] took drugs from the home" of Joseph Lumia and Kayla Mooney during the August 30, 2020, robbery, despite knowing that only money was taken, and that Agent McKinney failed to inform the Grand Jury that Marsh had taken three ecstasy pills prior to his first interview with law enforcement in June of 2021. (*Id.* at 20-21, 25-26).[20]

"[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendant[]." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988).

> Our conclusion that a district court exceeds its powers in dismissing an indictment for prosecutorial misconduct not prejudicial to the defendant is supported by other decisions of this Court. In *United States v. Mechanik,* 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986), we held that there is "no reason not to apply [Rule 52(a)] to 'errors, defects, irregularities, or variances' occurring before a grand jury just as we have applied it to such error occurring in the criminal trial itself." *Id.,* at 71-72, 106 S.Ct., at 942. In *United States v. Hasting,* 461 U.S., at 506, 103 S.Ct., at 1979, we held that "[s]upervisory power to reverse a conviction is not needed as a remedy when the error to which it is

---

[20] The Court notes that Defendant's argument as to this issue may be untimely. *See* Fed. R. Crim. P. 12(b)(3)(A)(v) (requiring that "defenses, objections, and requests" relating to "an error in the grand-jury proceeding or preliminary hearing" "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits."). The Court will nonetheless address Defendant's assertions with respect to Agent McKinney's grand jury testimony.

addressed is harmless since, by definition, the conviction would have been obtained notwithstanding the asserted error." We stated that deterrence is an inappropriate basis for reversal where "means more narrowly tailored to deter objectionable prosecutorial conduct are available." *Ibid.* We also recognized that where the error is harmless, concerns about the "integrity of the [judicial] process" will carry less weight, *ibid.,* and that a court may not disregard the doctrine of harmless error simply "in order to chastise what the court view [s] as prosecutorial overreaching." *Id.,* at 507, 103 S.Ct., at 1979. . . It would be inappropriate to devise a rule permitting federal courts to deal more sternly with nonconstitutional harmless errors than with constitutional errors that are likewise harmless.

*Id*. at 255-256. *See also*, *United States v. Soberon,* 929 F.2d 935, 940 (3d Cir. 1991) (holding "that the presentation of the allegedly perjured testimony to the grand jury does not fall into the narrow category of cases in which dismissal of charges without a showing of prejudice is warranted.").

Furthermore, as a general rule, even assuming that the Government engaged in prosecutorial misconduct by presenting material misstatements to a grand jury, "the petit jury's guilty verdict render[s] any prosecutorial misconduct before the indicting grand jury harmless." *United States v. Console*, 13 F.3d 641, 672 (3d Cir. 1993) (citing *Mechanik,* 475 U.S. at 70-72). *Cf. United States v. Bansal*, 663 F.3d 634, 660 (3d Cir. 2011) ("Even if it were true that prosecutors made material misstatements to the grand jury, each of the grand jury's findings of probable cause was later ratified in full by the petit jury, thus curing the defects [Defendant] now alleges."). As the Supreme Court explained in *Mechanik,* prosecutorial misconduct before a grand jury may have "the theoretical potential to affect

the grand jury's determination whether to indict these particular defendants for the offenses

with which they were charged." 475 U.S. at 70.

> But the petit jury's subsequent guilty verdict means not only that there was
> probable cause to believe that the defendants were guilty as charged, but also
> that they are in fact guilty as charged beyond a reasonable doubt. Measured
> by the petit jury's verdict, then, any error in the grand jury proceeding connected
> with the charging decision was harmless beyond a reasonable doubt.

*Id.*

In the present case, Defendant Wong has failed to demonstrate that he suffered any

prejudice as a result of any misstatements made by Agent McKinney during his testimony to

the Grand Jury on September 15, 2021, January 19, 2022, and/or February 22, 2023.

Defendant asserts that Agent McKinney "presented materially false information to the Grand

Jury", when that he incorrectly informed the Grand Jury that Marsh told him that both drugs

and money had been taken instead of only money during the robbery of Lumia's residence

on August 30, 2020. This limited portion of Agent McKinney's testimony does not directly

relate to any decision by the Grand Jury to return charges as to the other robberies, or

attempted robbery, at issue, the firearm charges, or the two conspiracies. Although it is

evident that Agent McKinney's testimony before the Grand Jury did differ in one respect

from Marsh's statements during his second interview with Agents on August 19, 2021, about

what was taken from Lumia's residence, at trial, the jury directly heard from Marsh the

evidence of which Defendant Wong complains the Grand Jury was not made aware.

Specifically, Marsh testified that "[w]e took a cash box with cash proceeds in it and I had

taken sweatshirts." (Trial Tr., Test. of Marsh, June 13, 2024, at 69). However, Marsh also admitted that he told Wong prior to the robbery that Lumia kept large amounts of cash and marijuana at his house (*id.* at 57-58) and, that during the robbery, while Solomon Rodriguez was looking for the cash, Marsh was "looking for marijuana" (*id.* at 70). Marsh's trial testimony, in conjunction with the testimony of LaSalle, Batista, and Mooney, presented the jury with ample evidence to determine that, at minimum, cash was stolen from the Lumia residence and that this cash was largely, if not entirely, the result of drug dealings. The Government was not required to prove that controlled substances were, in fact, stolen on August 30, 2020, in order to convict Wong in Counts 3 and 4 for his involvement in this robbery. Nor, as relevant here, does Defendant challenge the sufficiency or weight of the evidence regarding the convictions as to these counts (*see* Doc. 240, at 2).

Accordingly, Defendant Wong's assertion of prosecutorial misconduct as a result of Agent McKinney's misstatements to the Grand Jury with respect to Marsh's statements relating to the Lumia robbery do not entitle him to relief, including the dismissal of this action or a new trial.

### 4. "Scheme" to Prevent Favorable Testimony of Shannon Flemming

On June 14, 2024, Defendant Wong called Shannon Fleming, a woman present at Jesse Smith's house during the attempted robbery of August 29, 2020, as a defense witness. Although the Government had previously subpoenaed Fleming, it later decided not to call her as a witness for the prosecution. (*See* Doc. 256, at 54-55).

Prior to Fleming's testimony that day, Agent McKinney had testified and was asked

about Fleming on cross-examination by counsel for Wong:

Q. . . . I want to talk about Shannon Fleming, because Shannon Fleming is, by all accounts, not a criminal; correct?

A. Correct.

Q. She was one of the victims of the robbery on August 29; correct?

A. Yes.

Q. And you know, as well as I, that, as it relates to Josh Marsh's involvement, she had incriminating information; correct?

A. She believes she did.

Q. And you guys cancelled that subpoena and you didn't produce her testimony in front of this jury; correct?

A. I don't produce subpoenas, sir.

Q. After I subpoenaed her, did you guys have an opportunity to, again, over this past week, interview Shannon Fleming?

A. Yes, we did.

Q. Who interviewed her?

A. Myself and AUSA Buchanan.

Q. And, at that point -- I mean, I don't have any 302 report about what she said -- so what did she say?

A. She didn't say anything.

Q. But you guys showed her evidence; correct?

97

A. We showed her a -- we allowed her to listen to a recording of another cooperator.

(Trial Tr., Test. of McKinney, June 14, 2024, at 170-171).  Following this exchange, at

sidebar, the Government explained to the Court that:

> The Government played the statement of Co-Defendant Mo Zeidan, who has been severed from the case, where he takes responsibility as the person calling up to the cops in the house, which they [the jury] have not heard any evidence of, because that's the reason for the severance, the duress.

(*Id.* at 171).  Subsequently, on cross-examination, Agent McKinney continued as follows:

> Q. So a lot of the statements in this investigation come from cooperators. We can agree with that; correct?
>
> A. Yes, we could.
>
> Q. Shannon Fleming, after you guys knew I had subpoenaed her to come here and testify, you guys, again, interviewed her, yourself and [AUSA] Buchanan; correct?
>
> A. Correct.
>
> Q. And you showed -- and you guys told her, We don't believe Jesse Smith was involved on August 29 correct -- not Jesse Smith -- Josh Marsh; correct?
>
> A. Correct.
>
> Q. And, in that regard, you said you showed her an interview; correct?
>
> A. Correct.
>
> Q. And so we have had interviews from Batista; correct?
>
> A. Correct.
>
> Q. We have had interviews from LaSalle; correct?

A. Correct.

Q. You had an interview from Mo Zeidan; correct?

A. Correct.

Q. And the only interview you showed her was from Mo Zeidan; correct?

A. Correct.

Q. You did show her Batista's interview, where he says Marsh was involved; correct?[21]

A. Correct, because Mo Zeidan's was the more relevant.

Q. And you didn't show her the picture of Jesse Smith or of Josh Marsh that he posted, regarding Jesse Smith; correct?

A. No.

Q. And the other piece of evidence that we brought in, we can agree, that Mr. Marsh, from the prison, is on a recorded phone call, and that call, wherein, he's requesting that Shannon come and testify on his behalf at sentencing, because she's one of the victims of the robberies. You heard that call; correct?

A. I did.

Q. So did that make you question as to whether or not he was involved on August 29?

A. No.

Q. Okay, so he just wants the victim of a robbery to come and testify on his behalf in a robbery he's not involved in; correct?

---

[21] Although the trial transcript states that counsel's question was "You did show her Batista's interview. . . ", in light of the context of the exchange, this appears to be a typographical error and that counsel's question was "you didn't show her Batista's interview."

A. Yes. I believe, in the transcript that you posted, he actually says, She, said anybody as often as possible. She, was referring to his first attorney, who was a female, and was trying to get him the best assistance that she could.

Q. Why would you want a victim to testify on your behalf in a robbery that you were not involved in?

A. Because it's a victim of a robbery that is still advocating for somebody.

Q. Well, that's your theory; right?

A. Well, it's up to the jury to decide.

(*Id.* at 172-174).

Later that same day, Wong called Shannon Fleming, out of order, as a witness for the defense. Fleming testified that she was at the house on August 29, 2020, with her then-boyfriend Jesse Smith. (Trial Tr., Test. of Fleming, June 14, 2024, at 211). On direct examination, Wong's counsel questioned Fleming about her relationship with Marsh, as well as what she had previously told the Government and when these conversations occurred:

Q. . . . . Since that night, where there was the home invasion of the home you were in on August 29 of 2020, did you ever come to learn who, if anyone, was involved in that home invasion?

A. Yes.
. . . .

Q. Did you ever have any conversations with anybody, following the home invasion, about that home invasion?

A. Yes.

Q. Who was that individual?

A. Josh Marsh.

100